**SO ORDERED.**

**SIGNED this 10th day of June, 2011**

**THIS ORDER HAS BEEN ENTERED ON THE DOCKET.
PLEASE SEE DOCKET FOR ENTRY DATE.**

_Shelley D. Rucker_
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

In re:                                              No. 09-16159
                                                    Chapter 11 Debtor
THOMAS E. SETTLES, SR.,

          Debtor;


THOMAS E. SETTLES, SR.,

          Plaintiff,

v                                                    Adversary Proceeding
                                                     No. 10-1322

UNITED STATES OF AMERICA,

          Defendant.


### Memorandum

Plaintiff Thomas E. Settles, Sr. ("Plaintiff" or "Debtor") brought an action against the

United States of America, through its agency, the Internal Revenue Service ("IRS"), seeking this

court's determination of the appropriate amount of taxes owed by the Plaintiff pursuant to 11

U.S.C. § 505(a)(1).  [Doc. No. 1-1, Complaint].[1]  The IRS responded that its total assessment of

$641,201.58 in taxes, penalties, and interest as of the petition date is accurate.

The IRS has filed a motion for summary judgment regarding its assertion that the total

amount of taxes, penalties, and interest listed in its Proof of Claim is accurate.  [Doc. No. 24].

The Plaintiff opposes the motion for summary judgment.  [Doc. No. 38].  In the Motion, the IRS

specifically sought rulings on whether the debtor could claim different amounts for his income

and deductions than those which the IRS had previously allowed in its Notice of Deficiency,

whether the debtor could use the tax rates for individuals married filing jointly, whether the

debtor was entitled to claim expenses incurred in the operation of a horse training and breeding

business, and whether the debtor was estopped from challenging the penalties imposed on him

for accuracy and promoting a tax shelter. The court has reviewed the briefing, the applicable

law, and the record and has determined that the IRS's motion will be **GRANTED** as to the

specific issues raised, but **DENIED** as to the specific amount of the tax liability.

### I.    Background

Because the IRS has filed a motion for summary judgment the court must review the

facts in the light most favorable to the non-moving party, in this case the Plaintiff.  Viewing the

facts in this light, for purposes of this motion only, the court finds the following facts.

### A.    The IRS's Proof of Claim

The Debtor filed his Chapter 11 bankruptcy petition on September 25, 2009.  Complaint,

¶ 1; *see also* [Case No. 4:09-bk-16159, Doc. No. 1].  On October 26, 2009 the Defendant IRS

filed a Proof of Claim in the amount of $641,201.58 with $487,270.33 listed as secured by a

recorded tax lien and $153,931.25 listed as unsecured.  *See* [Case No. 4:09-bk-16159, Claim 1-

---

[1] All citations to the court's docket entries are for the docket pertaining to Adversary
Proceeding 4:10-ap-1322, unless otherwise noted.

1("Proof of Claim")].  The Proof of Claim lists the following taxes, penalties and interest that the

IRS claims the Plaintiff owes it:

**Secured Claims**

| Kind of Tax | Tax Period | Date Assessed | Tax Due | Penalty to Petition Date | Interest to Petition Date |
|---|---|---|---|---|---|
| Income | 12/31/1999 | 6/23/2003 | $66,737.00 | $41,213.00 | $54,949.35 |
| Income | 12/31/2000 | 6/23/2003 | $97,111.00 | $64,064.76 | $64,814.95 |
| Income | 12/31/2001 | 6/10/2002 | $2,396.80 | $91.00 | $1,844.25 |
| Income | 12/31/2001 | 8/2/2004 | $24,017.00 | $7,211.49 | $13,352.21 |
| Income | 12/31/2002 | 12/22/2003 | $0.00 | $184.70 | $15.11 |
| Income | 12/31/2002 | 2/9/2004 | $32,274.00 | $0.00 | $15,156.06 |
| Income | 12/31/2002 | 8/2/2004 | $1,203.00 | $69.77 | $564.88 |
| Total: | | | **$223,738.80** | **$112,834.72** | **$150,696.81** |

**Total Amount of Secured Claims:     $487,270.33**

**Unsecured Claims**

| Kind of Tax | Tax Period | Date Tax Assessed | Tax Due | Interest to Petition Date |
|---|---|---|---|---|
| Income | 12/31/1998 | 6/23/2003 | $37,857.20 | $48,769.97 |
| Civil Penalty | 12/31/1998 | 1/5/2004 | $0.00 | $3,788.52 |
| Civil Penalty | 12/31/1999 | 1/5/2004 | $0.00 | $2,946.66 |
| Civil Penalty | 12/31/2000 | 1/5/2004 | $0.00 | $4,997.32 |
| Civil Penalty | 12/31/2001 | 1/5/2004 | $0.00 | $1,262.85 |
| Total: | | | $37,857.20 | $61,765.32 |

Penalty to Date of Petition on Unsecured General Claims:     $54,308.73

**Total Amount of General Unsecured Claims: $153,931.25**

*See* Proof of Claim.

The IRS asserts that its Proof of Claim relates to unpaid income taxes for 1998 to

2002 and unpaid promoter penalties from 1998 to 2001.  *See* [Doc. Nos. 24-4, 24-5, 24-6, Exs.

101, 102, 103].  The IRS assessed the 1998, 1999, and 2000 taxes after it conducted an audit

of the Plaintiff's tax returns in 2001.  *See* [Doc. No. 38-14, Plaintiff's Affidavit in Support of Brief

in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Aff."), ¶ 1].  The 2001

and 2002 income tax liabilities alleged by the IRS derive from the amended returns that the

Plaintiff filed that eliminate his tax shelter strategy. *See* [Doc. No. 24-1, IRS' Memorandum in

Support of Motion for Summary Judgment ("IRS Memo"), p. 2]; [Doc. Nos. 24-7, 24-8, Exs. No.

104 and 105, Settles' Amended Tax Returns for 2001 and 2002]; [Doc. No. 24-2, IRS's

Statement of Facts].  The Plaintiff filed his amended return for 2001 on or about March 1, 2004

and his amended return for 2002 on or about December 19, 2003.  IRS's Statement of Facts, ¶¶

4-5.  The IRS asserts that it assessed civil penalties pursuant to 26 U.S.C. § 6700 against the

Plaintiff at $1,000 for each of 31 different client entities to whom he promoted his tax strategy.

IRS Memo, p. 3.  The penalties assessed were $9,000 in 1998, $7,000 in 1999, $12,000 in

2000, and $3,000 in 2001.  *See* [Doc. No. 24-6, Ex. No. 103].  The IRS also supplied transcripts

of the debtor's payments toward these liabilities which have been made. [Doc. No. 24-6 and 7,

Exs. No. 102 and 103].

     The Plaintiff's position is that the amount of taxes claimed by the IRS is incorrect and

that the assessments for negligence penalties and late payment penalties against him are

improper. He further contends that the accrual of interest should have been suspended or was

to have been abated. [Doc. No. 38,p. 38] Plaintiff also files his contention of how the payments

and assessments should have been calculated. [Doc. No. 48-9].

     **B.**     **Plaintiff's Disbarment Proceedings Before the IRS**

     In support of its motion for summary judgment, the IRS has filed a Decision issued by

the Office of Professional Responsibility ("OPR") of the IRS, Department of the Treasury on

March 2, 2006.  [Doc. No. 24-11, Ex. No. 108, ("OPR Decision")].  The OPR Decision

summarizes the investigation undertaken by the IRS into the Plaintiff's income, expenses, and

taxes owed.  The OPR Decision concludes by disbarring the Plaintiff from practicing before the

IRS.

Because the OPR Decision provides a helpful background into the basis of the IRS'

investigation into the Plaintiff's financial affairs, the court has relied on it for a summary of the

factual history of the relations between the parties as asserted by the IRS.  Although the Plaintiff

disagrees with the findings in the OPR Decision, the Plaintiff does not deny that the OPR

Decision was issued and that, following an appeal, remand, and subsequent appeal, the

decision resulted in his disbarment from practice before the IRS.  The Plaintiff asserts that he

did not participate in the hearing before the OPR because the OPR did not accommodate his

hearing disability.  He contests the findings of the OPR as inaccurate and asserts that he was

denied his due process rights at the hearing based on his inability to participate because the

court did not make modifications to allow him to hear and understand the proceeding.

The OPR Decision found that the Plaintiff is an attorney and a certified public accountant

who was licensed to practice before the IRS.  OPR Decision, p. 1.  According to the OPR

Decision, the Plaintiff began a solo practice in estate and tax planning in Tennessee in 1989.

*Id.* at p.2.

The OPR Decision summarizes the IRS' findings as follows:

In 1992, Settles began developing a tax strategy involving the transfer
and lease of a tax payer's goodwill as well as the setting up of related entities
such as living trusts, limited partnerships and management companies.  In 1998,
he began selling this tax strategy to his clients.  In 2000, the Respondent set up a
website providing income tax planning information to his clients and the public.

In August 2001, Settles was notified by the IRS that his personal tax
returns for 1998, 1999, and 2000 were being audited.  On April 1, 2002, Settles
was informed that the IRS was considering action under sections 6700,
"Promoting abusive tax shelters, etc.," and 7408, "Action to enjoin promoters of
abusive tax shelters, etc.," of the IRS Code, 26 U.S.C. §§ 6700 and 7408, based
on the tax strategy that he had developed.

In August 2002, Settles was notified that, as a result of the examination of
his tax returns, changes in his 1998, 1999 and 2000 tax returns would be made.
The adjustments to his income were made because of disallowance of parts of
his tax strategy.  In March 2003, Notices of Deficiency were issued to him for his

1998, 1999 and 2000 returns.  Settles did not avail himself of his right to contest
the deficiencies in the Tax Court, so on June 23, 2003, the deficiencies were
assessed against him.  Federal Tax Liens were filed against him on October 31
and November 14, 2003.  As of the date of the hearing, these remain unpaid.

A Final Judgment of Permanent Injunction was entered by the United
States District Court for the Middle District of Tennessee against Settles on
March 24, 2003.  In it, Settles was enjoined from organizing, promoting,
marketing or selling his tax strategy.

OPR Decision, p. 2.  The OPR Decision relates that in January of 2004, the IRS informed the

Plaintiff that it was charging him penalties for the tax years of 1998 to 2001 for promoting an

abusive tax shelter.  *Id.*  The penalties consisted of $1,000.00 for each client who had utilized

the tax strategy that the IRS deemed to be an abusive tax shelter.  *Id.*

The IRS selected Plaintiff's tax returns for audit based on a "claimed rent expense

deduction in the form of a facility fee."  OPR Decision, p. 4.  In conducting an investigation into

the Plaintiff's financial affairs, a Senior Revenue Agent with the IRS, Robert Hissam, found that

the Plaintiff's clients were all using the same strategy drastically to reduce their personal income

taxes.  *Id.* at p. 4.  At the hearing before the OPR, Mr. Hissam testified:

What I found was that Mr. Settles organized and promoted an abusive tax shelter
and that this abusive tax shelter used multiple related entities in order to
substantially reduce tax, and that before and after the creation of these multiple
related entities, the taxpayer continued to control–have dominion and control
over the income and the assets and continued to have enjoyment of those
assets.

*Id.* at p. 4 (quoting Testimony of Mr. Robert C. Hissam).  The OPR Decision summarizes the

following regarding Hissam's findings relating to the Plaintiff's alleged tax shelter:

Hissam related that the basics of the shelter are as follows: (1) the taxpayer
transfers his "goodwill," residence and automobiles to a living trust of which the
taxpayer or his wife is trustee; (2) the trust then transfers the "goodwill," the
residence and sometimes the automobiles to a family limited partnership (FLP)
consisting of the taxpayer, spouse, any children and a general partner; (3) the
spouse and children contribute nothing to the partnership for their partnership
interest; (4) a management company, a corporation owned by the taxpayer, is set
up as the general partner of the FLP, with a one percent interest, to manage the
assets of the FLP; (5) the FLP pays the management company a management
fee for managing the assets; (6) the management company hires the taxpayer,

his spouse and children as employees of the company; (7) the taxpayer enters into a facilities fee arrangement with the FLP to rent back his "goodwill," residence and automobiles; (8) the taxpayer deducts from his gross receipts the facilities fee as a rent expense; (9) the facilities fee is reported as income by the FLP, but is reduced by personal living expenses of the family, such as maintenance and upkeep of the residence, real estate taxes, mortgage interest and the management fee paid to the management company; (10) the management company pays its employees a salary in the form of tax free fringe benefits, such as health insurance, split dollar life insurance and tuition reimbursement; and (11) any of the rent income to the FLP that is not reduced by the facilities fee payment is distributed as income to the family members.

"Goodwill," the facilities fee and the management fee are not based on "arms length" negotiations.  "Goodwill" is the difference between what a well experienced person, the taxpayer, earns and what an entry-level person with no experience would earn in the same profession or occupation.  The amount of the facilities fee is determined by the value of the goodwill being "rented."  The amount of the management fee is generally determined by the cost of the tax free fringe benefits.

Hissam testified that there are several problems with the use of this arrangement from a federal tax standpoint: (1) "the taxpayer has assigned his income to his children and to the management company in order to obtain lower federal income tax rates;" (2) "the taxpayer would be permitted through this arrangement to deduct mortgage interest, the real estate taxes, contributions on the family limited partnership, while at the same time claiming the standard deduction at the Form 1040;" (3) "personal living expenses were oftentimes deducted at the family limited partnership in the form of maintenance and upkeep of this residence.  The taxpayer had full enjoyment, continued use of the residence while paying no rent to the family limited partnership for that use;" (4) the taxpayer "reduced his earned income for self-employment tax return purposes;" (5) because of "the reduced amount of income being reflected by the taxpayer, certain taxpayers were able to claim the child tax credit that they would not otherwise have been permitted to claim;" (6) "[c]ertain taxpayers who received Social Security income were able to reduce the amount of Social Security income that was taxable to them by virtue of reduced income;" (7) "[c]ertain of the taxpayers were able to avoid the limitations on exemptions and itemized deductions" that occur when adjusted gross income reaches a certain threshold; (8) "the management company was able to reduce income by claiming fringe benefits that were not otherwise deductible."

OPR Decision, pp. 4-5.

The OPR Decision found that Plaintiff himself had been using the strategy explained

*supra* since 1995 for his personal taxes, with minor variations.  The family limited partnership

was called Canterbury Run, LP ("FLP"). His wife and children were members, but Plaintiff was

not. The management company was called Canterbury Run Holding Company, Inc.
("Management Company"). OPR Decision, p. 6. The Plaintiff's wife, Dawn Cooper Settles[2]
("Cooper"), was a 20% partner of Canterbury Run through the Dawn Cooper Settles Living
Trust. *Id.* at p. 7. Plaintiff's two children were each 20% partners in the FLP, and his wife's
children were 20% and 19% partners in the FLP. *Id.* The Management Company was a 1%
partner. Plaintiff's wife was the president of the Management Company. Plaintiff was its
secretary-treasurer, and each child was a vice president. *Id.* The entity entitled the Dawn
Cooper Settles Living Trust was the only shareholder of the management company. *Id.* The
Plaintiff described and verified the strategy in his deposition. [Doc. No. 38-15, Ex. O, Deposition
of Thomas E. Settles, Sr. ("Settles Dep."), pp. 252-257].

At the OPR hearing level, Plaintiff alleged that he transferred his "goodwill" to his wife in
1992. However, the administrative law judge ("ALJ") found that Plaintiff and his wife did not
enter into any written agreement relating to the transfer of "goodwill" and that his wife provided
no consideration for the transfer. OPR Decision, p. 7. Prior to the marriage, Plaintiff's ex-wife
owned a horse farm known as Canterbury Run. The farm, which included a house and barn,
was used by Plaintiff and his family as their residence. Plaintiff contends that there was
consideration for the transfer. He testified at his deposition, that, in order to get his wife to marry
him, be the mother to his children and give up her job as a consultant, Plaintiff promised Cooper
an annual income of $45,000. Settles Dep., p. 71. Plaintiffs' promise was reduced to writing but
the only copies of the agreement were lost in a house fire that occurred in 1997. *Id.* at 71, 84,
and185. When the FLP was created in 1995 or 1996, Plaintiff provided that Cooper was
contributing her right to receive the $45,000 a year to the partnership as consideration for the
FLP's rights in the facility fees arrangement with Plaintiff. *See* Settles Dep., pp. 252-53.

---

[2]  The Plaintiff was married to Dawn Cooper Settles from 1992 until they divorced in
2002. Plaintiff is currently married to Eve Settles.

The consummation of these transactions is in question.  Plaintiff never paid $45,000 to Cooper.  Cooper never sought to enforce the marital agreement.  Settles Dep., p. 260.  With respect to the contribution of the farm to the FLP,  Plaintiff asserted that Cooper transferred the farm to the FLP in 1996, but the county land records revealed that a transfer did not occur until December 31, 2001.  *Id.*  Plaintiff's explanation for the delay was that the transfer could not be made until the mortgage was satisfied in order to avoid the consequences of a "due on sale" clause in the deed of trust.  *Id.* at 84.

In the OPR Decision the ALJ found that the FLP:

> paid the mortgage interest, taxes, utilities, repairs and upkeep, as well as for furniture and upgrades for the property.  The FLP also paid for groceries, clothing, tuition, health and automobile payments for the benefit of the Settles family.  At the same time the family continued to enjoy the full use and benefit of the property as if they owned it.

OPR Decision, p. 7.

The ALJ determined that the proof demonstrated that the Plaintiff's law proprietorship entered into a "facilities fee" agreement with his wife, through the FLP, to lease from the FLP the goodwill of the law practice, furniture and equipment for the practice, office space and credit for a sum of $113,989.00 in 1998, $155,250.00 in 1999, and $213,641.00 in 2000.  OPR Decision, p. 7.

Hissam informed the Plaintiff that the IRS had decided to disallow the "facilities fee" deductions for the 1998, 1999, and 2000 tax returns.  The Plaintiff disagreed with that determination, and the IRS issued its "30-day letter" indicating its decision.  The Plaintiff did not appeal the adjusted amounts within the requisite time frame.  OPR Decision, p. 7.  On June 23, 2003 the IRS issued the Plaintiff a notice of deficiency and charged him: additional tax of $52,339.00, interest of $15,258.61, and penalties of $13,861.52 for 1998; additional tax of $66,737.00, interest of $19,898.27, and penalties of $18,018.99 for 1999; and additional tax of

$97,111.00, interest of $21,059.27, and penalties of $25,733.26 for 2000. *Id.* at pp. 7-8. The

ALJ found that the Plaintiff failed to protest the tax, penalties and interest. *Id.* at p. 8. In the

OPR Decision the ALJ concluded that "Settles' 1998, 1999 and 2000 tax returns employed an

abusive tax shelter, which was a sham lacking economic substance and resulted, at the very

least, in the claiming of inaccurate tax deductions." *Id.*

In discussing the Plaintiff's promotion of his tax strategy, the OPR Decision outlined the

content of the Plaintiff's former website and found that 34 individuals, couples, and/or

businesses had utilized Plaintiff's suggested strategies. OPR Decision, p. 13. The ALJ found

that "[t]he Settles tax shelter has never been upheld by the IRS or any court of competent

jurisdiction." *Id.*

The OPR Decision notes that the U.S. District Court for the Middle District of Tennessee

issued a consent judgment that permanently enjoined the Plaintiff from "organizing, promoting,

and selling tax packages lacking economic substance . . . ." OPR Decision, p. 13. On January

5, 2004 the IRS assessed penalties of $31,000 against the Plaintiff for promoting abusive tax

shelters in the years 1998, 1999, 2000, and 2001. *Id.* at p. 15. The penalties were based on

$1,000 penalty for each tax shelter found by the IRS. *Id.*

The ALJ found "clear, convincing and uncontested evidence" that the Plaintiff, among

other things, "[o]rganized, promoted and encouraged an abusive tax shelter in which

participants transferred assets to trusts and partnerships, and rented the assets back for a fee;

and in which the partnership paid a management fee to a participant-owned corporation to serve

as general partner; and in which the corporation took improper deductions of a personal nature;

. . . ." OPR Decision, p. 16. The ALJ determined that the Plaintiff violated 31 C.F.R. §§

10.22(a), (b) and (c), as well as 31 C.F.R. §§ 10.33(a)(3) and (a)(4) and § 10.34(a). *Id.* The

ALJ further concluded that the Plaintiff engaged in "disreputable conduct" in violation of 31

C.F.R. § 10.51 by failing timely to pay his 2001 taxes and by failing timely to file his 2002 tax

return.  *Id.* at p. 18.  The OPR Decision ultimately determined that:

> For most of his career as an attorney and certified public accountant, Settles has
> practiced before the Internal Revenue Service.  In the 1990's he developed a
> patently fraudulent tax strategy to avoid paying the taxes he would normally have
> owed.  He first did this with his own taxes and then marketed the scheme to other
> tax payers, to encourage and advise them to defraud the government.  Clearly,
> one who seeks to undermine the tax system should not be permitted to practice
> before the agency administering that tax system.  The use and marketing of the
> abusive tax shelter requires nothing less than the ultimate sanction of
> disbarment.

*Id.* at p. 19.

Plaintiff appealed the OPR Decision to the Secretary of the Treasury.  The Special

Counsel delegated to decide Plaintiff's disciplinary appeal reviewed the OPR Decision and

affirmed many of the ALJ's conclusions of law.  *See* [Doc. No. 38-10, Ex. J, ("Initial Decision on

Appeal")].  The Initial Decision on Appeal also reversed the ALJ's finding regarding one charge

against the Plaintiff and vacated and remanded one charge for further consideration.  It also

vacated and remanded for further consideration of the appropriate sanction.  *See id.*  On

remand, the ALJ dismissed one charge and concluded that the sanction of disbarment

remained appropriate.  [Doc. No. 24-9, Ex. 106, ("Remand Decision")].  The Special Counsel

then affirmed the Remand Decision and disbarred the Plaintiff from further practice before the

IRS.  [Doc. No. 24-10, Ex. 107 ("Remand Appeal Decision")].

### C.   Plaintiff's Original Individual Tax Returns

In support of its motion for summary judgment, the IRS has provided this court with

copies of the tax returns the Plaintiff originally filed with the IRS in 1998, 1999, 2000, and 2001.

[Doc. No. 24-19, Ex. 114].  For 1998 the Plaintiff reported $0 income on his Form 1040 and took

the standard deduction for married filing separately of $3,550.  *Id.*  Therefore, he reported that

he owed the IRS no taxes.  In his Schedule C for 1998 relating to Profit or Loss from Business

for a Sole Proprietorship, Plaintiff reported a gross income of $187,165.  He listed expenses of

$647 for advertising; $5,723 for car and truck expenses; $1,727 for insurance; $3,800 for other

interest; $113,989 for rent; $1,183 for repairs and maintenance; $3,053 for supplies; $1,715 for

taxes and licenses; $7,546 for meals; $9,302 for utilities and $38,480 for "other expenses." *Id.*

at p. 3.  The total expenses added up fortuitously to $187,165, the exact amount of Plaintiff's

gross income reported.  *Id.*  By subtracting these expenses from the gross income, Plaintiff

achieved his total income of $0 as reported on his Form 1040.

For the 1999 year the Plaintiff again reported $0 income on his Form 1040.  [Doc. No.

24-19, p. 5].  His original Schedule C reports a gross income of $214,965.  However, the

Plaintiff's expenses again add up to exactly $214,965, giving him a net profit of $0.  He reported

expenses of $10,451 for car and truck expenses; $1,779 for insurance; $1,728 for other interest;

$155,250 for rent; $12,013 for supplies; $110 for taxes and licenses; $15,344 for travel; $6,883

for utilities; and $11,407 for other expenses.  *Id.*

For the year 2000 the Plaintiff reported an adjusted gross income of $10,342 on his

Form 1040 with a total tax liability of $1,473.  [Doc. No. 24-19, p. 7].  His Schedule C indicated a

gross income of $312,339 and total expenses of $301,210 for a net profit of $11,129.  *Id.* at p. 9.

Plaintiff's listed expenses for 2000 included: $10,219 for car and truck expenses; $6,830 for

insurance; $26,045 for office expenses; $213,641 for rent; $1,667 for repairs and maintenance;

$12,279 for travel; $9,450 for utilities; and $21,079 for other expenses.

On his Form 1040 for 2001, the Plaintiff listed a total income of $23,285 with a total tax

liability of $5,281.  [Doc. No. 24-19, pp. 13-14].  Plaintiff's Schedule C reported a gross income

of $130,096 and total expenses of $108,722 for a net profit of $21,374.  He listed expenses of:

$5,700 for insurance; $87,425 for rent; $3,000 for repairs and maintenance; $2,400 for supplies;

$631 for taxes and licenses; $3,300 for utilities; and $6,266 for other expenses.  *Id.* at p. 14.

The income reflected on Form 1065 tax returns for the FLP filed from 1998 through 2001

corresponds to the expense amount for the "rent" that Plaintiff deducted from his income.  *See*

[Doc. Nos. 24-13, 24-14, 24-15, Ex. 110].  For example, on the 1998 Form 1065 for FLP, the

entity's income includes $113,989 for rent, which is the amount of "rent" deducted as an

expense from Plaintiff's individual original 1998 Schedule C.

For these four tax years the Plaintiff filed returns reporting an aggregate income of

$864,565 from his law practice, but a tax liability of only $6,754.

### D.    IRS Notice of Deficiency

In support of its motion for summary judgment, the IRS has filed the Notice of

Deficiency that it sent to Plaintiff on February 3, 2003 describing its findings regarding Plaintiff's

obligation to pay additional taxes.  *See* [Doc. No. 24-4, Ex. 101, Notice of Deficiency].

For the year ending December 31, 1998 the IRS found a corrected taxable income of

$131,144.00.  It disallowed the payment of $113,989 for rental expenditures.  Notice of

Deficiency, p. 5.  For the year ending December 31, 1999 the IRS found a corrected taxable

income of $167,515.00.  It disallowed the $155,250 rental payment.  *Id.*  For the year ending

December 31, 2000 the IRS determined Plaintiff had a corrected taxable income of $243,915.  It

disallowed the $213,641 rental expense deducted by the Plaintiff.  *Id.*  After making adjustments

to Plaintiff's income and expenses, the IRS determined that Plaintiff owed it $51,339 for 1998,

$66,737 for 1999, and $97,111 for 2000.  *Id.*

The Notice of Deficiency also assesses accuracy penalties against the Plaintiff in the

following amounts: 1998 - $10,267.80; 1999 - $13,347.40; 2000 - $19,422.20.  Notice of

Deficiency, p. 6.

The Notice of Deficiency provides a detailed explanation of what the IRS deemed to be a

lawful deduction and which deductions were disallowed.  For example, many of Plaintiff's

claimed deductions for travel expenses were not allowed because such expenses were not

"adequately substantiated (as to amount or deductibility)."  Notice of Deficiency, p. 8.  The "rent"

expenses were disallowed for several reasons, including "because they have not been

established as being ordinary and necessary expenditures under I.R.C. § 162" and because

"Canterbury Run, LP . . . has no economic substance . . . ."  *Id.*  The Notice of Deficiency also

explains the assessment of penalties for "negligence or disregard of rules or regulations" and/or

"a substantial understatement of income tax".  *Id.* at p.9.

> ### E.    Permanent Injunction Issued Against Plaintiff

On November 8, 2002 the United States filed a complaint for a permanent injunction

against Plaintiff in the United States District Court for the Middle District of Tennessee.  [Doc.

No. 24-16, Ex. 111 ("IRS Complaint")].  The IRS Complaint sought to enjoin the Plaintiff from

promoting the abusive tax shelter described in the OPR Decision.  *See* IRS Complaint.  On

March 24, 2003 the district court entered a consent decree and final judgment of permanent

injunction that resolved the IRS's claims against the Plaintiff.  *See* [Doc. No. 24-17, Ex. 112,

("Final Judgment")].  In the Final Judgment the court found and ordered the following:

> . . . 2.  The Court finds that Settles has neither admitted nor
> denied the United States' allegations that he has engaged in
> conduct that is subject to penalty under §§ 6700 and 6701 of the
> Code and that interferes with the enforcement of the Internal
> Revenue Laws.
>
> 3.  The Court finds that Settles has consented to the entry of
> judgment for injunctive relief pursuant to Code §§ 7402 and 7408
> to prevent him from (1) engaging in conduct subject to penalty
> under §§ 6700 and 6701 of the Code; and (2) organizing,
> promoting, and selling tax packages lacking economic substance
> involving the use of multiple entities, including trusts, partnerships
> and corporations, to shelter participants' income and to serve as
> vehicles for improper expenses through the manipulation of asset
> transfers and assignments of income.
>
> 4.  It is further ORDERED, ADJUDGED AND DECREED that
> Settles, individually and doing business as or through any other
> entity, . . . is permanently enjoined and restrained from, directly or
> indirectly, by the use of any means or instrumentalities:
> (a) Organizing, promoting, marketing, or selling any abusive tax
> shelter, plan or arrangement that advises or encourages
> taxpayers to attempt to violate the internal revenue laws or
> unlawfully evade the assessment or collection of their federal tax
> liabilities;
>
> (b) Taking any action in furtherance of the organization,

promotion, marketing, or selling of tax shelters in which
participants transfer assets to trusts and partnerships, and rent
those assets back for a fee; and in which the partnership pays a
management fee to a participant-owned corporation to serve as
general partner; and in which the corporation takes improper
deductions of a personal nature;

(c) Making false representations that:

(i) individuals or entities may transfer or assign their
income or assets to a trust or limited partnership
and rent them back for the purpose of income
spreading to evade federal tax;
(ii) personal expenses can be paid by a limited
partnership in order to obtain tax benefits not
available to others;
(iii) personal expenses can be paid by a family-
owned corporation in order to obtain tax benefits
not available to others; . . . .

*Id.*

## F.      Testimony from Plaintiff's Deposition

Plaintiff disputes much of what the ALJ determined in the OPR Decision.  He contends

that he utilized a tax strategy that had a good faith argument based in applicable law.  In

Plaintiff's deposition testimony he explains some of his positions regarding his tax strategy:

In terms of how many times did I use a strategy to try to push unearned income
to family members who were older than age 14, my response is every single time
I could, and . . . I would have been remiss if I didn't do it.  I mean, my job as a tax
lawyer, . . . is to advocate for my client.  If it's unearned income and the. . .
family member is over 14, why anybody in their right mind would pay at . . . 38
percent . . . why would they pay at a 38 percent rate if they could have paid a 15
percent rate?

Settles Dep., p. 111.  Plaintiff also admits in his deposition that his own attorney cautioned him

that the "law isn't there yet" in terms of the IRS and courts approving the Plaintiff's tax strategy.

Settles Dep., p. 114.

In addition to his contention that his wife did provide consideration for her interest in the

FLP, he also contends that he employed his wife as an office manager. However, Plaintiff

admitted in his deposition that he wrote no checks to his wife for her employment.  Settles Dep.,

p. 180.  Nor did he file any W-2 or 1099 forms on her behalf as her employer.  *Id.*  He did not

withhold any money from her income for tax purposes.  *Id.*  Although Plaintiff contends that he

and his wife agreed that she should earn $45,000 a year, the Plaintiff admits that he never paid

her that amount annually.  He further admits that he paid $150,000 in unearned income to his

and her children.  In explaining why he never paid his wife a salary, he stated:

> . . . she and I both believed or I believed that . . . our kids were receiving
> $150,000 a year in unearned income produced by my goodwill and my . . . the
> documents, the referral system, et cetera, as complete compensation for
> everything.  I mean, that's why there was no $45,000 paid.  In fact, that was part
> of her consideration, recited as a contribution to the partnership agreement, was
> her agreement from me to pay her $45,000 a year.

Settles Dep., p. 182.

Plaintiff outlined the entire strategy as found in the OPR Decision in his deposition.

Settles Dep., pp. 252-57.  He explained how the "facilities fee" constituted the rental expense

that he claimed on his tax returns for the years 1998 through 2001.  *Id.*  He described the rental

expense in the following way:

> Then Canterbury Run LP entered into an agreement with T. Edward Settles
> Attorney at Law called, I think, a facilities fee agreement that said that I, the
> lawyer, promised to rent from Canterbury Run LP my license to practice – my –
> my copyrighted documents, my referral source, my office equipment, and the use
> of an automobile in return for a payment of $150,000 per year payable in arrears.

Settles Dep., pp. 254-55.  He further explained that:

> Canterbury Run Holding Company also employed [the Plaintiff's and his wife's
> children] to work in the partnership business.  Most of that work was farming
> related although they did do some stuff for the law business to the extent that
> they could, address some stuff, helping with mailing, things like that, for which
> they were paid solely in the form of tax-free benefits which were tuition
> reimbursements.

*Id.* at 255-56.  He admits that the "effect" of his tax strategy was that "at least $150,000 of [his]

law income is going to go into Canterbury Run and be filtered down to [his] children."  *Id.* at 265.

He further explained that the "tax strategy" came into play only after what he termed the "estate

planning and income protection aspect of the plan."  *Id.*  He admits that he might have arranged

a "facilities fee" agreement for up to 18 of the 31 clients the IRS determined had engaged in the Plaintiff's tax shelter plan. *Id.* at 277-78.

### G.   Plaintiff's First 2001 and 2002 Amended and Filed Returns

Plaintiff filed several amended returns for the periods of 2001 and 2002. His latest amended return for 2001 was filed on March 1, 2004. This was the fourth amended tax return filed for 2001. *See* [Doc. No. 24-7, Ex. 104]; [Doc. No. 24-2, IRS Statement of Facts, ¶ 4]. Plaintiff's amended 2001 Form 1040 indicates an adjusted gross income of $101,516 and a tax liability of $26,441. [Doc. No. 24-7, Ex. 104]. The Plaintiff listed legal fee income of $130,096 and expenses totaling $22,317 for car and truck expenses, office expenses, supplies, taxes and licenses, meals and entertainment, utilities, and other expenses. *Id.*

Plaintiff filed an amended return for 2002 on December 19, 2003. *See* [Doc. No. 24-8, Ex. 105]; [Doc. No. 24-2, IRS Statement of Facts, ¶ 5]. The amended 2002 Form 1040 lists adjusted gross income of $119,197 and a tax liability of $32,933. [Doc. No. 24-8, Ex. 105]. Plaintiff listed total gross income of $179,656 and total expenses of $38,670 for car and truck expenses, depreciation, insurance, other, legal and professional services, office expenses, other business property, supplies, taxes and licenses, travel and meals, and utilities. *Id.* The Plaintiff has not paid any of the taxes he listed as due on these amended returns. IRS Statement of Facts, ¶¶ 4-5.

### H.   Plaintiff's Unfiled Returns

Plaintiff is not attempting to challenge directly the OPR's determination that he engaged in an abusive tax shelter. Rather, Plaintiff contends that he should be allowed to recalculate his tax liability based on the positions he believes the IRS took in its analysis of the facilities fee arrangement and the OPR findings regarding the FLP's lack of economic substance. To that end, he prepared amended tax returns showing his present contentions regarding his income, his deductions and his filing status. These amended returns show the differences in his current

contentions as compared with his previously filed returns and the findings of the IRS

examination as noted in the Notice of Deficiency. The Plaintiff filed a spread sheet summarizing

these three calculations of his liability. Late Filed Exhibits 1-5. [Doc. Nos. 48-1 through 48-9]

These amended returns have not been filed with the IRS.  *See* [Doc. No. 24-3, Declaration of

Duston K. Barton ("Barton Decl."), ¶¶ 1-2]; [Doc. No. 24-12, Ex. 109].  Plaintiff asserts that these

unfiled returns properly reflect the tax liability owed to the IRS based on the positions taken by

the IRS in assessing the taxes and penalties.  *See* Settles Dep., pp. 135-36.  These unfiled tax

returns were provided to the IRS in response to discovery requests.  *See* Barton Decl., ¶ 1. At

oral argument on the IRS's Motion for Summary Judgment, the parties agreed that they were

prepared by Plaintiff as a means to show where there were disputes with the IRS's

assessments.  On their face, the unfiled returns reflect that disputes exist regarding the correct

amount of income which the Plaintiff received during the relevant period, the amount of

deductions for expenses incurred by the Plaintiff in his law practice and for payments he made

to support the FLP's operations, and the appropriate tax rate to apply to the taxable income.

Many, if not all, of the numbers on the unfiled returns are different from the original tax returns

filed by Plaintiff and from the amounts allowed by the IRS following its examination. [Doc. Nos.

48-1 - 48-9, Late Filed Exhibits Nos. 1-6].

Plaintiff's support for his numbers on the unfiled returns is a Quicken database which

was provided to the IRS. The database was created from Plaintiff's review of bank statements

for all of the accounts that Plaintiff could find and that were used by either Plaintiff, Cooper, or

their businesses.  Settles Dep. pp. 133, 140-41.  Plaintiff attempted to reconstruct his business

expenses from these bank statements and accompanying cancelled checks almost ten years

after the checks were written.  At the oral argument, Plaintiff admitted that the checks did not

contain references that would explain what the checks were written for.  He attributed the

payments to various categories of expenses based on his recollection of his business practices

and based on the names of the payees on the checks.  *Id.* at 292.  The IRS asserts that it was

provided no original financial records pertaining to the expenses and income listed in the unfiled

returns.  The IRS contends that Plaintiff

> has provided no records from 1998 to 2002 to substantiate his claimed income
> and expenses.  Specifically, Settles has not produced a single ledger, receipt,
> cancelled check, bank statement, credit card statement, or invoice to
> substantiate his income or claimed expenses for any of the tax years at issue in
> this suit.

Barton Decl., ¶ 5.  The Plaintiff disputes this contention by the IRS and asserts that he provided

the IRS with some bank statements and cancelled checks in mid-December 2010.  However, he

admits that the records he allegedly provided to the IRS were not original receipts, business

ledgers, or other business records that would validate the business-related nature of claimed

expenses shown on bank statements or cancelled checks. Plaintiff admitted that even if the IRS

had received the bank statements and checks which he has, the checks would provide no

information other than the account name, the date, the amount and the name of the payee. As

mentioned above, Plaintiff would have to interpret whether the check was one which Plaintiff

believed qualified as a deductible expense.  These same records were also not definitive proof

of the amount of income. Plaintiff was not sure whether deposits were for income or from

account transfers unless he could match a transfer amount and date. Settles Depo. at 282 -288.

### 1. 1998 Unfiled Return

On the unfiled 1998 Form 1040 the Plaintiff checks that he is in the "married filing jointly"

category.  [Doc. No. 24-12, Ex. 109].  His original tax returns from 1998 through 2001 were filed

as married filing separately.  *See* [Doc. No. 24-19, Ex. 114].  The Plaintiff lists business income

of $94,206.48 and claims a farm loss amount of $49,289.49.  He also lists $45,000 to Cooper,

his ex-wife, as "other income" from her alleged office manager position, which Plaintiff admits

was never paid.  Therefore, his total income listed is $89,916.99 and his adjusted gross income

is $85,184.01. [Doc. No. 24-12, Ex. 109].  Plaintiff itemized his deductions and obtained a total

of $15,660.57 for taxes due and subtracted $10,000 of payments he claimed he had made

towards the taxes for a total amount of $5,660.57 for taxes owed.  *Id.*  Although the Plaintiff

signed the unfiled return, Cooper, who was married to him in 1998, did not sign the return. The

record indicates that Cooper is not willing to sign an amended return showing a tax liability.

[Doc. No. 39-1, Deposition of Dawn Cooper ("Cooper Dep."), p.61]

In his unfiled Schedule C form for 1998, the Plaintiff lists a total gross income of

$171,424.50.  He deducts a total of $75,469.65 for his law firm expenses, including $45,000 for

Cooper's salary, to arrive at his total income of $94,206.48.  [Doc. No. 24-12, Ex. 109].  His

other expenses include $1,886.58 for travel expenses, $779.85 for meal expenses, $853.02 for

supplies, $4,257.81 for car and truck expenses, $2,005.29 for insurance expenses, $465.83 for

other interest, $10,792.92 for office expenses, $200 for taxes and licenses, and $9,228.35 for

other expenses.  *Id.*  Along with his 1998 Form 1040, the Plaintiff completed a Schedule F form

relating to Profit or Loss from Farming relating to his ex-wife's horse farm, known as Canterbury

Run.  *Id.*  He reported a gross income from the farm of $11,346.85 and total expenses of

$60,636.34 and a net loss of $49,289.49.  *Id.*  The expenses included amounts for car and truck

expenses, depreciation, feed purchased, insurance, mortgage interest, labor hired, repairs,

supplies, taxes, utilities, professional fees and dues, travel, miscellaneous, advertising and

business development, office expenses, and equipment.  *Id.*

2. 1999 Unfiled Return

Plaintiff's unfiled 1999 Form 1040 stated a total business income of $145,187.04, farm

loss of $49,189.27, and other income of $45,000 for his wife's salary as office manager.  [Doc.

No. 24-12, Ex. 109].  He listed his total income as $140,997.77 and his adjusted gross income

as $133,262.03.  *Id.*  He again claims he should be able to file as married filing jointly.  *Id.*  Only

Plaintiff signed the 1040 Form, which reflects a tax liability of $36,754.36.  *Id.*  Plaintiff's unfiled

Schedule C for 1999 reflects a gross income of $229,501.00 and total expenses of $79,158.  *Id.*

With an additional deduction of $5,155.33 for the business use of his home, the Plaintiff

calculated his net income as $145,187.04.  His expenses included the $45,000 for his wife's

salary along with expenses for advertising, car and truck expenses, insurance, other interest,

legal and professional services, office expenses, supplies, travel, meals, utilities, and other

expenses.  *Id.*  Plaintiff also provides a Schedule F form relating to his alleged losses

associated with his ex-wife's horse farm.  He lists income of $11,196.46 for the horse farm and

expenses of $60,385.73.  *Id.*  The expenses include expenses similar to those claimed on the

unfiled 1998 Schedule F form.  *See id.*

### 3. 2000 Unfiled Return

The Plaintiff's unfiled 1040 for 2000 states a business income of $216,146.52, farm

losses of $70,785.06, and Plaintiff's wife's salary of $45,000 as "other income" for a total income

amount of $190,361.46 and an adjusted gross income of $181,631.14.  [Doc. No. 24-12, Ex.

109].  Plaintiff indicated that he could file as "married filing joint return" even though only he

signed the unfiled return.  *See id.*  He listed the amount of tax owed as $46,392.14.  On his

unfiled Schedule C for 2000, the Plaintiff listed gross income of $320,312.00 and total expenses

of $99,431.21.  *Id.*  His expenses included $45,000 for his wife's salary, $16,314.65 for utilities,

$6,829.93 for office expenses, $11,844.44 for other expenses, as well as expenses for other

categories.  *See id.*  On his Schedule F relating to the horse farm, the Plaintiff listed income of

$8,867.37 and expenses of $79,652.43 for a net loss of $70,785.06.  *Id.*

### 4. 2001 Unfiled Return

On the unfiled Form 1040 for 2001, Plaintiff listed business income of $21,653.71, farm

loss of $66,559.73, and other income of $45,000 in the form of his wife's salary.  [Doc. No. 24-

12, Ex. 109].  He listed his total income as $1,978.98 and his adjusted gross income as

$777.33.  *Id.*  He indicated that he should be filing as married filing jointly, although his ex-wife

did not sign the return.  *Id.*  On this particular unfiled return, Plaintiff indicates that he overpaid

his taxes by $150.00.  *Id.*  On his unfiled Schedule C he indicates that he had gross income of

$110,744.00 and total expenses of $85,130.96.  *Id.*  The expenses included $45,000 for his

wife's office manager salary and expenses for advertising, car and truck expenses, insurance,

supplies, utilities, and other expenses.  The unfiled 2001 Schedule F form relating to profits or

losses from farming indicated a gross income of $7,324.90 and total expenses of $73,884.63 for

a net loss of $66,559.73.  The expenses included such items as $15,250.00 for mortgage

interest, $12,940.91 for repairs and maintenance, and $10,686.08 for feed purchased.  *Id.*

### 5. 2002 Unfiled Return

The Plaintiff also provided the IRS with unfiled married filing jointly tax returns for 2002.

[Doc. No. 24-12, Ex. 109].  Again, only Plaintiff signed the return.  *Id.*  He listed business income

of $92,347.53, farm loss of $27,530.50 and other income of $45,000 for his wife's office

manager salary for a total income of $109,851.03 and adjusted gross income of $104,730.27.

*Id.*  On his unfiled Schedule C he listed gross income of $175,720.82 and total expenses of

$81,163 with a net profit of $92,347.53.  The expenses included such items as $45,000 for

Plaintiff's wife's office manager salary, $5,915.33 for car and truck expenses, $3,982.13 for

insurance, $5,496.26 for legal services, and $10,306.64 for utilities.  *Id.*  On his Schedule F

relating to the horse farm's profits and losses, he listed gross income of $2,446.12 and total

expenses of $29,976.62 for a net loss of $27,530.50.  *Id.*  The listed expenses included such

items as feed expenses, depreciation, supplies, utilities, car and truck expenses, and insurance

expenses.  *Id.*

### 6. Preparation of the Unfiled Returns

During Plaintiff's deposition the IRS's attorney attempted to gain some insight into how

the Plaintiff recalculated his income and expenses as reflected on the unfiled returns.  For

example, the attorney noticed that in his original 1998 Schedule C form the Plaintiff listed $647

for advertising expenses.  *See* Settles Dep., p. 145.  In the unfiled return the Plaintiff listed no

advertising expenses, and the IRS attorney questioned the Plaintiff regarding the discrepancy. *Id.* The Plaintiff responded that he may have recategorized the $647 as an office expense in the unfiled return and indicated that "the only kind of advertising expense I can recall that I incurred was work on a brochure, a firm brochure that just said Eddie Settles and gave my credentials, and that could have happened in '98, the first work on it could have happened in '98." *Id.* at pp. 146-47.

The Plaintiff further tried to explain why the unfiled returns occasionally demonstrated a reduction in income.  Plaintiff stated Cooper  "did summaries of fees so it's entirely possible that in 1998 I didn't even look at the deposits.  I didn't look at the deposits until 2010 when I'm trying to figure out what actually happened in all these accounts."  Settles Dep., p. 149.

In explaining the expenses in his unfiled returns, Plaintiff agreed that he was still deducting expenses for lunches with Cooper at restaurants because they had weekly business meetings at various restaurants.  Settles Dep., p. 289.  The Plaintiff categorized such expenses as "law office expenses."  *Id.*  In certain cases, such as expenses of $33.67 to a Chinese restaurant, the Plaintiff had "no idea why that was listed as a law office expense."  *Id.* at 290. He obtained much of the information for his unfiled returns by poring over Quicken software database information in 2010 that related to the years 1998 to 2002.  Settles Dep., pp. 159-165.

The Plaintiff asserts that he has images of banking records to support the amounts in the unfiled tax returns, but the IRS contends that it only received copies of the Quicken software database records.  *See* Settles Dep., pp. 159-165; Barton Decl., ¶ 4.  The Plaintiff contends that he provided the IRS with banking records and cancelled checks in December of 2010 that supported the Quicken database records.  The IRS's position is that it never received any such records in December of 2010.  However, the Plaintiff admits that he does not possess any underlying original financial records, such as receipts or business ledgers, or even notations on the cancelled checks themselves, that provide substantive support for the business-related

nature of the deductions asserted.  Therefore, he does not dispute that he has not provided the IRS with any such substantive records.

In explaining various "law office expenses" for restaurant receipts, the Plaintiff testified that in 1998 many business meetings were conducted in restaurants with his wife as they were living in a double wide trailer.  Settles Dep., p. 291.  Regarding an expense deduction for an expenditure made at the bookstore, Barnes & Noble, the attorney for Defendant asked the Plaintiff, "how do you know no more than 10 years later that this expense on June 2nd, 1998 was a law office expense as opposed to a personal expense at Barnes & Noble?"  Settles Dep., p. 291.  The Plaintiff responded, "[t]he only time I ever went to Barnes & Noble I spent $3.50, which you'll see a lot of those expenses on there, for coffee.  If I spent $30 it was for a law office book, either some sort of computer book or – or something like that. . . ."  *Id.* at 292.  He admitted, however, that "that was based on my assumption, my assumption based on my recollection.  It's not based on any currently available documentation."  *Id.*  When questioned about two restaurant expense deductions for a single day, the Plaintiff admitted that he might not have had two business meetings at two different restaurants on the same day.  *Id.* at pp. 293-94.  He explained that at the "business meetings," he and his wife conducted, "everything that we talked about was either about the farm or about the law business or about kids.  I don't think we ever had meetings where all of those were not discussed.  And as I understand the rules, the rules are a meaningful business discussion has to occur."  *Id.* at p. 295.  He admitted that a law office expense for more than one business meeting a week at a restaurant would probably be a mistake.  *Id.* at p. 295.

### 7. Cooper Testimony

Cooper, Plaintiff's ex-wife who was married to him during the relevant time period, testified that she always owned the residence and the ten-acre property that she used for the horse farm prior to "somewhere between 2001 and 2002."  [Doc. No. 39-1, Cooper Dep., pp. 14-

15].  She never received any of the $45,000 salary that Plaintiff deducted on his tax returns and

did not consider herself a law office manager.  *See id.*, pp. 33-34, 59-60.  She owned the horse

farm during her marriage to Plaintiff.  *Id.* at p. 42.  Cooper has no idea if she or her children

were ever employed by the Managment  Company or whether she was its president.  *Id.* at p.

56.  Cooper indicated that she has no intention of signing a "joint tax return that shows an

outstanding tax liability for past years."  *Id.* at p. 61.  Cooper never negotiated a $150,000

payment from Plaintiff's law office to Canterbury Run.  *Id.* at p. 73.

## II.    Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this

district provide this court with jurisdiction to hear and decide this adversary proceeding.  The

Plaintiff's action regarding the liquidation of the estate's assets is a core proceeding.  *See* 28

U.S.C. § 157(b)(2)(O).  *See also, Kreidle v. Dep't of the Treasury, Internal Revenue Service (In

re Kreidle*), 143 B.R. 941, 945 (D. Colo. 1992); *In re Shepherd*, 230 B.R. 835, 838 (Bankr. W.D.

Tenn. 1998).

## III.    Standard of Review

Federal Rule of Bankruptcy Procedure 7056 makes Federal Rule of Civil Procedure 56

applicable to bankruptcy adversary proceedings.  *See* Fed. R. Bank. P. 7056.  Summary

judgment is appropriate if there is no genuine issue as to any material fact and the moving party

is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The burden is on the moving

party to show conclusively that no genuine issue of material fact exists, and the Court must view

the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving

party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,475 U.S. 574, 587 (1986); *Morris v.

Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n,

Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435

(6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations.  The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435.  The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof.  *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

### IV.    Analysis

11 U.S.C. § 505(a)(1) states:

> Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

11 U.S.C. § 505(a)(1).  However, as the United States Supreme Court has made clear, "[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code."  *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 1955 (2000).  Further, "[b]ankruptcy courts are not authorized in the name of equity to make wholesale substitution of underlying law controlling the validity of creditors' entitlements, but are limited to what the Bankruptcy Code itself provides."  *Id.* at 24-25, 120 S.Ct. at 1957.

The IRS contends that the tax liability amount of $641,201.58 provided in its Proof of Claim is the proper amount of federal taxes owed by Plaintiff.  Plaintiff, on the other hand, asserts that the amounts alleged in his unfiled tax returns represent the amount of federal taxes that the IRS should assess against him.  *See* [Doc. No. 24-12, Ex. 109]; Settles Dep., pp. 135-

136.  He claims that his total net income tax liability, when certain payments of taxes by him are included, should be $103,220.03.  *See* [Doc. No. 38, Plaintiff's Response in Opposition to Motion for Summary Judgment ("Plaintiff's Response"), p. 8].  He contests the "original assessment figures, the appropriateness of accuracy penalties, and the legality of late payment penalties as well as a portion of interest assessments."  *Id.*  He further contests civil penalties under 26 U.S.C. § 6700, as well as interest on those penalties.

The IRS makes four primary arguments regarding why Plaintiff's differences between the unfiled returns and the IRS' numbers on its proof of claim do not create genuine issues of fact:

1)  Plaintiff has failed to substantiate his income and expenses on his tax returns in accordance with the requirements of the Internal Revenue Code and applicable caselaw;

2) as a matter of law, Plaintiff's tax liability may be calculated only as married filing separately, not married filing jointly;

3) as a matter of law, Plaintiff cannot claim any deductions for the horse farm losses; and

4) Plaintiff is estopped from contesting the appropriateness of the accuracy penalties and the late payment penalties listed on the Proof of Claim.

## A.   Adequate Substantiation

The Internal Revenue Code ("I.R.C.") allows businesses to deduct "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business."  26 U.S.C. § 162(a).  However, this broad right of deduction "is tempered by the requirement that any amount claimed as a business expense must be substantiated, and taxpayers are required to maintain records sufficient therefor."  *Megibow v. C.I.R.*, T.C.M. 2004-41, 2004 WL 309153, at *11 (Feb. 19, 2004); *see also*, 26 U.S.C. § 6001; *Hradesky v. Commissioner of Internal Revenue*, 65 T.C. 87, 89-90 (1976).  The Supreme Court has noted that "an income tax deduction is a matter of legislative grace and that the burden of clearly

showing the right to the claimed deduction is on the taxpayer." *INDOPCO, Inc. v. C.I.R.*, 503

U.S. 79, 84, 112 S.Ct. 1039 (1992). *See also, Brown v. Comm'r of Internal Revenue*, T.C.

Summ. Op. 2010-97, 2010 WL 2813417, at *2 (July 19, 2010) (noting that "[i]n general, the

Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer

bears the burden of proving, by a preponderance of the evidence, that these determinations are

erroneous"). The burden of proof remains on the taxpayer even when the issue of tax liability

arises in the context of bankruptcy. *See Raleigh*, 530 U.S. at 17, 26, 120 S.Ct. at 1953; *see*

*also, Internal Revenue Service v. Levy (In re Landbank Equity Corp.)*, 973 F.2d 265, 271 (4th

Cir. 1992). The burden of proof may shift to the IRS only once the taxpayer has provided

adequate substantiation and has maintained all records regarding expenses that the I.R.C.

requires him to maintain. *See* 26 U.S.C. § 7491; *In re Coleman*, 417 B.R. 712, 720 (Bankr. S.D.

Miss. 2009).

As the Tax Court has explained:

> When a taxpayer adequately establishes that he or she paid or incurred a
> deductible expense but does not establish the precise amount, we may in some
> circumstances estimate the allowable deduction, bearing heavily against the
> taxpayer whose inexactitude is of his or her own making. There must, however,
> be sufficient evidence in the record to provide a basis upon which an estimate
> may be made and to permit us to conclude that a deductible expense, rather than
> a nondeductible personal expense, was incurred in at least the amount allowed.

*Megibow*, 2004 WL 309153 at *11 (citations omitted); *see also Cohan v. Comm'r*, 39 F.2d 540,

543-544 (2d Cir. 1930) (superseded by statute requiring strict substantiation of certain expenses

as explained below *infra*).

For certain expenses, however, 26 U.S.C. § 274 requires "strict substantiation," meaning

that a taxpayer must provide the IRS with adequate records or sufficient evidence to corroborate

the taxpayer's statement to substantiate expenses such as travel expenses, entertainment

expenses, and gifts pursuant to the I.R.C. 26 U.S.C. § 274(d); *see also*, *Whitaker v. Comm'r of*

*Internal Revenue*, T.C. Memo. 2010-209, 2010 WL 3719246, at *4 (Sept. 23, 2010); *Bennett v.*

*Comm'r of Internal Revenue*, T.C. Memo. 2010-114, 2010 WL 2076232, at *3 (May 25, 2010).

The regulation issued by the IRS relating to recordkeeping under the I.R.C. states in relevant

part:

> . . . any person subject to tax under subtitle A of the Code . . ., or any person
> required to file a return of information with respect to income, shall keep such
> permanent books of account or records, including inventories, as are sufficient to
> establish the amount of gross income, deductions, credits, or other matters
> required to be shown by such person in any return of such tax or information.

26 C.F.R. § 1.6001-1(a).  Further the I.R.C. provides that no deductions are "allowed for

personal, living, or family expenses."  26 U.S.C. § 262(a).  Records contained in a personal,

financial software database, such as Quicken, may not serve to substantiate business expenses

without receipts or additional records to document the expenses.  *See Whitaker*, 2010 WL

3719246 at *4.

　　With respect to rent charged for a corporation's use of residential space for business

activities, such a rental must have proof of a "bona fide rental."  Factors to consider include

whether a rental agreement exists and whether the transaction is at arm's length.  If such

factors do not demonstrate a bona fide rental, deduction of the rental expense will be denied for

"lack of economic substance."  *Bruns v. Comm'r of Internal Revenue*, T.C. Memo. 2009-168,

2009 WL 2030886, at *15 (July 14, 2009).

　　The first dispute between the parties involves what evidence Plaintiff has provided to

support his contentions of the amounts due as represented in the unfiled returns. Plaintiff claims

that he offered to provide the IRS with "[a]ll bank statements, checks, and receipts used to

substantiate his income and claimed expenses for the years in question."  Plaintiff's Response,

pp. 13, 29.  However, such bank statements, checks and receipts are not included anywhere in

the record either supporting or opposing the IRS motion.  He further contends that "Defendant

did not request these items until complaining of their absence" in its memorandum in support of

the motion for summary judgment.  *Id.* at p. 31.  However, Plaintiff's statement is belied by the

record.  The IRS presents evidence of its multiple requests for such documents prior to the filing

of its motion for summary judgment.  *See e.g.* [Doc. Nos. 15, 15-1, Motion to Compel and

Memorandum in Support of Motion to Compel]; [Doc. No. 15-5, Ex. 103 to Defendant's Motion

to Compel, United States' First Request for Production of Documents]; [Doc. No. 15-8, Ex. 106

to Defendant's Motion to Compel, email dated 7/12/10 to Plaintiff's attorney from IRS attorney

seeking all documents supporting Plaintiff's deductions], IRS Reply, p. 4.

   The record demonstrates that the IRS requested supporting documentation to

corroborate the Plaintiff's Quicken software database records on numerous occasions.    At oral

argument before this court on April 11, 2011, the Plaintiff asserted that he supplied the IRS with

copies of bank statements and cancelled checks to support his asserted deductions for

expenses in mid-December of 2010, several weeks after this court granted the IRS's motion to

compel.  The IRS asserts that it never received any bank statements or cancelled checks from

the Plaintiff.  Therefore, the parties dispute the scope of the records provided by the Plaintiff.

However, the court concludes that this dispute of fact is immaterial for purposes of this motion.

The Plaintiff admits that he never provided the IRS with any underlying records to substantiate

the business-related nature of any claimed expense.  For example, he admits that he never

provided the IRS with receipts or business ledgers that support his assertion that particular

expenses were business-related and not personal in nature.  He also admitted that the checks

contained no references made contemporaneously with their issuance that would show whether

they were written for business expenses.  Therefore, the court finds that, viewing the facts in the

light most favorable to the Plaintiff, and assuming that the IRS received copies of bank

statements and cancelled checks in mid-December 2010, the Plaintiff has still failed to

substantiate his claimed business expenses by providing evidence which corroborates his

contentions that the amounts shown on the unfiled returns were business-related expenses.

   Plaintiff admits one deduction was never paid. The Plaintiff's unfiled tax returns include

$45,000 in deductions for his ex-wife's "salary" even though there is no evidence that he ever paid her any wages.  Settles Dep., pp. 180-181. Cooper agrees that she never received any "office manager" salary from Plaintiff.  *See*  Cooper Dep., pp. 33-34, 59-60.  Plaintiff further never withheld any income from her salary for federal tax purposes.  Settles Dep., p. 180. Based on the evidence provided, there is no genuine issue of fact that the Plaintiff had an expense for a law office manager, much less that he actually paid such an expense.

With respect to the other specific law firm expenses claimed, even Plaintiff's recollections are lacking in substantiation. When questioned at his deposition, he could not explain how certain alleged restaurant or book store expenses constituted deductions pursuant to 26 U.S.C. § 162 for "ordinary and necessary business expenses."  The record includes no evidence in the form of receipts, business ledgers, or other original financial documentation that might support the Plaintiff's claims of expense deductions.  Plaintiff's Quicken software records, reproduced as many as ten years after the alleged expenses were incurred, do not provide adequate substantiation of his expenses without other financial records to validate them.  *See Whitaker*, 2010 WL 3719246 at *4.

Therefore, because the record lacks any form of documentation or original records relating to the claimed business expenses for his law practice on Plaintiff's amended returns, the court concludes that there is no genuine issue of material fact regarding whether Plaintiff can meet his burden of substantiating his claimed income or expenses.

Plaintiff's opposition represents that the Plaintiff's counsel told the IRS that he would supply all of the "other supporting documentation" for the database used to prepare the unfiled returns. From the record there does not appear to be any other supporting documentation; but even if there were, a promise that evidence of substantiation will be forthcoming at trial is not sufficient to survive a motion for summary judgment.  *See, e.g., Hahn v. Sargent*, 523 F.2d 461, 467 (1st Cir. 1975); *see also, Dias v. Nationwide Life Ins. Co.*, 700 F.Supp.2d 1204, 1214 (E.D.

Cal. 2010) (noting that "'[a] genuine issue of material fact does not spring into being simply

because a litigant claims that one exists or promises to produce admissible evidence at trial'")

(quoting *del Carmen Guadalupe v. Agosto*, 299 F.3d 15, 23 (1st Cir. 2002)).  Plaintiff has

provided no reason why he withheld such bank statements from the IRS until mid-December

2010 when they are obviously material to his amended tax returns and were requested by the

IRS.  Further, Plaintiff does not dispute the fact that he does not possess any receipts or

business records that would support the business-related nature of any deposits or payments

reflected in his bank statements.  Plaintiff bears the burden of substantiating his income and

expenses, and if he had records of substantiation, he has had ample opportunity in this litigation

to produce them and rely on them in opposition to the IRS' motion for summary judgment.

### B.      Married Filing Jointly

As reflected in the unfiled returns, the Debtor contends that his returns should be treated

as though he was married filing jointly.  A person who has filed a separate tax return may file a

joint return after the period of filing taxes for that year has expired, except that such a joint

return may not be filed "after the expiration of 3 years from the last date prescribed by law for

filing the return for such taxable year (determined without regard to any extension of time

granted to either spouse); . . ."  26 U.S.C. § 6013(b)(2)(A).  Further, a separate return may not

be changed to a joint return "after either spouse has commenced a suit in any court for the

recovery of any part of the tax for such taxable year. . ."  26 U.S.C. § 6013(b)(2)(C).  Liability for

taxes on joint tax returns is joint and several.  26 U.S.C. § 6013(d)(3).  In *Lytle v. United States*

the district court reviewed the limitations period pursuant to 26 U.S.C. § 6013(b)(2)(A) and found

that "if a separate return has been filed for the taxable year, then the limitations period set forth

in § 6013(b)(2) is applicable . . . unless plaintiff can establish that the Internal Revenue Service

agreed to extend the limitation period."  No. C2-90-019, 1990 WL 120647, at *2 (S.D. Ohio July

13, 1990).

In addition, the I.R.C. provides that "any return . . . required to be made under any provision of the internal revenue laws or regulations shall be signed in accordance with forms or regulations prescribed by the Secretary." 26 U.S.C. § 6061.  The IRS regulations state that unless an agent is signing for one or both spouses, joint tax returns must be signed by both spouses.  26 C.F.R. § 1.6013-1(a)(2).  In addition, "[t]he duty to sign a tax return is on the taxpayer."  *Olpin v. Comm'r of Internal Revenue*, 270 F.3d 1297, 1301 (10th Cir. 2001).

> Plaintiff asserts that
>
> his true tax liability must be computed using the married filing jointly rates.  The IRS contends that Plaintiff's actions were directed at minimizing the Settles' family tax liability and to conserve as many assets as possible for the family. Given that position, it is inconsistent for the IRS to argue in this litigation that Plaintiff must use married filing separately status in asking the Court to determine his true tax liability.

Plaintiff's Response, p. 31.  Plaintiff cites no legal authority for this proposition.

Federal case law is clear that "[t]he general rule when a tax return is unsigned is that it is invalid."  *Olpin*, 270 F.3d at 1300 (citing *Lucas v. Pilliod Lumber Co.*, 281 U.S. 245, 249, 50 S.Ct. 297 (1930); *Brafman v. United States*, 384 F.2d 863, 868 (5th Cir. 1967); *Shea v. Comm'r*, 780 F.2d 561, 568 (6th Cir. 1986); *Doll v. Comm'r of Internal Revenue*, 358 F.2d 713, 714 (3d Cir. 1966)).  In *Olpin* the Tenth Circuit noted that "one exception" exists where one spouse has signed the return.  270 F.3d at 1301.  The court may then conduct "an inquiry as to the intent of the other spouse."  *Id.* (citing *Hanesworth v. United States (In re Hanesworth)*, 936 F.2d 583, 1991 WL 114639 (10th Cir. June 26, 1991)).  In *Olpin* the court concluded that this exception was unavailable as a matter of law where the non-signing spouse "refused to sign the joint return."  270 F.3d at 1301.

In this action Plaintiff's ex-wife has clearly stated that she has no intention of signing the amended joint return that Plaintiff has prepared.  Cooper Dep., p. 61.  Plaintiff cannot demonstrate that Cooper ever signed joint tax returns while they were married.  She further

indicated in her deposition that she was not interested in signing an amended tax return that
demonstrated a tax liability owed.  *Id.*

Further, the time limitation for filing an amended joint return has expired.  *See* 26 U.S.C.
§ 6013(b)(2)(A).  Plaintiff asserted at oral argument that his wife signed a waiver of the statute
of limitations during the IRS's original audit.  However, no such waiver is in the record.  In
addition, the IRS responds that any such waiver tolls the statute of limitations only for the
duration of the audit, not permanently.  This dispute is not germane to the motion for summary
judgment here because the Plaintiff cannot demonstrate that his ex-wife ever intended to file a
joint tax return.  Plaintiff's argument that the IRS has taken inconsistent positions with respect to
his individual situation has no support in the law.  Plaintiff cites to no legal requirement that he
be allowed to amend his return after the expiration of three years and without the signature of
his spouse so that he may minimize his income tax liability.  The court concludes that the IRS
has demonstrated that no genuine issue of material fact exists regarding whether the Plaintiff
should be allowed to amend to file his return as married filing jointly.  Therefore, the Plaintiff's
tax liability was correctly assessed based on his filing his returns "married filing separately."

### C.    Status of Canterbury Run Deductions

Plaintiff argues that he should be entitled to deduct the expenses of his ex-wife's horse
farm, Canterbury Run.  *See* [Doc. No. 24-12, Ex. 109].  The unfiled returns reflect that, if
allowed to do so, he would have additional deductions for the years 1998 through 2002.  The
IRS contends that Plaintiff is not entitled to deduct such expenses for several reasons.  First, it
argues that Plaintiff was never entitled to the horse farm deductions prior to 2001 as his ex-wife
owned the horse farm until 2001.  The horse farm deductions relate to the horse farm owned by
the FLP; however, Plaintiff admits that his ex-wife did not transfer the horse farm to the FLP until
February 15, 2001, and the transfer was not recorded until December 13, 2001.  *See* Plaintiff's
Response, p. 28.  Therefore, prior to 2001 the horse farm expenses were not part of the FLP.

Before 2001, Cooper owned the horse farm.  Settles Dep., pp. 41, 68; Cooper Dep., pp. 12-14.

As the IRS points out, Cooper was responsible for the horse farm and its expenses prior to the

transfer to the FLP.

The IRS also argues that Plaintiff cannot obtain the benefit of the horse farm deductions

because those deductions have already been included in the tax returns of the FLP.  The FLP

has already filed tax returns for the years 1998 through 2001.  *See* [Doc. Nos. 24-13, 24-14; Ex.

110].  In those returns the FLP deducted certain expenses relating to the operation of the horse

farm.  For example, on the 1999 FLP Schedule F relating to profits or losses from farming, the

partnership listed $106,310 in expenses.  *See id.*  In the 2000 FLP "other expenses" category,

the FLP deducted $25,404 for farm supplies, $2,747 for feed, $7,508 for utilities, and $2,362 for

bank charges.  In 2001, the FLP filed tax returns indicating $37,829 on its Schedule F for

expenses relating to the horse farm.  *Id.*  For the year 2002, the FLP's Schedule F shows

expenses of $25,406 relating to the total farm losses.  *Id.*

The IRS argues that the FLP tax returns have been filed and Cooper and their children

have benefitted from the deductions taken on those tax returns.  Thus, it argues, the Plaintiff

cannot now have the benefit of deductions that have already been utilized by the FLP.

Plaintiff argues that once the "facilities fee" rental payment is removed from the FLP

returns, the FLP will not reflect any income, and Plaintiff's ex-wife and children would not be

liable for any taxes for the FLP because it did not have any income.  However, Plaintiff cites to

no authority indicating that he may unilaterally amend the FLP tax returns years after they were

filed.  He was not even a partner in the FLP, and Plaintiff has cited no law or other authority

indicating that he may claim the horse farm deductions even if he could substantiate that he

paid expenses of the horse farm on his individual return more than a decade later.

The court acknowledges that the FLP had substantially more expenses than it had

income.  Without the "rental income" from Mr. Settles' practice, those losses exceeded the

FLP's income.  Mr. Settles now argues that *he*, not the FLP,  should be allowed to take those

deductions if the IRS is not going to acknowledge his tax structure. He argues that if the IRS

contends that the FLP had no economic substance, then the horse farm was a family business.

As the primary income producer, he contends that he should be allowed to take the deductions

for the expenses he paid.  However, the horse business and FLP are not the Plaintiff's alter

ego.  That operation was owned by others.  Cooper operated the horse training business

before, during, and after her marriage to Plaintiff.  The members of the FLP have not sought to

amend its returns.  Plaintiff may not now disregard the corporate form in which Cooper operated

her business because that form no longer provides him personally with the tax advantages he

had hoped to gain.  Taxpayers may not ignore "the corporate form when adoption of that form

has served a business purpose."  *In re Barry*, 48 B.R. 600, 604 (Bankr. M.D. Tenn. 1985) (citing

*Moline Properties, Inc. v. Comm'r of Internal Revenue*, 319 U.S. 436, 63 S.Ct. 1132 (1943)).  As

the Tenth Circuit noted in *Crouch v. United States*, "[u]nder the Internal Revenue Code, bright-

line choices are available to taxpayers with regard to the form in which to operate businesses.

Because taxpayers are permitted to select the form in which they do business, with different

forms subject to different tax rules, the choice of entity is generally binding."  692 F.2d 97, 99

(10th Cir. 1982).

In *Commissioner of Internal Revenue v. Nat'l Alfalfa Dehydrating & Milling Co.* the U.S.

Supreme Court explained:

> [t]his Court has observed repeatedly that, while a taxpayer is free to organize his
> affairs as he chooses, nevertheless, once having done so, he must accept the
> tax consequences of his choice, whether contemplated or not, and may not enjoy
> the benefit of some other route he might have chosen to follow but did not.  'To
> make the taxability of the transaction depend upon the determination whether
> there existed an alternative form which the statute did not tax would create
> burden and uncertainty.'

417 U.S. 134, 149, 94 S.Ct. 2129 (1974) (quoting *Founders General Corp. v. Hoey*, 300 U.S.

268, 275, 57 S.Ct. 457, 460 (1937)) (other citations omitted).  Further, a taxpayer is not allowed

to receive the benefit of two deductions for one expense.  "It is fundamental that one expense

may not give rise to two deduction[s]."  *Succession of Harrison v. United States*, 392 F.Supp.

1067, 1070 (D.C. La. 1975).  As the court in *Succession of Harrison* noted:

> Both business and non-business expenses incurred to incubate pecuniary gain
> are deductible only if they are 'ordinary and necessary'; generally when a
> taxpayer pays the debts of someone else, this is not considered an 'ordinary'
> expense.  The courts have been faced with numerous instances of taxpayer-
> stockholders attempting to deduct expenses that could properly have been
> claimed as business expenses by the corporation; these attempts have been
> uniformly rejected.

*Id.* at 1069.  The FLP tax returns were filed in the years 1998 through 2002, and the partners,

including Plaintiff's ex-wife and children, have already received the benefit of those deductions.

As the court in *Succession of Harrison* noted, "the corporation in fact could properly have

claimed the expenses; it was allowed a deduction for the costs of managing the property in

computing the tax it owed for the years 1960-1963."  *Id.* at 1070.

Even if the court were to find that the Plaintiff was operating a horse farming operation

and was entitled to take business deductions, he has a problem substantiating his expenses.

His only proof in the record demonstrating that he personally paid the expenses of the horse

farm is an inference to be drawn from the fact that he was the only party generating enough

income to fund the claimed expenses.  There are no receipts, business ledgers, or other

financial records substantiating the specific expenses he claims for the farm.  *See e.g.,* 26

U.S.C. § 162 (deductions allowed for "ordinary and necessary" business expenses).  A taxpayer

must retain such records that demonstrate his claimed deductible expenses.  *See Bennett*,

2010 WL 2076232 at *3.  The Tax Code requires that "[e]very person liable for any tax imposed

by this title, or for the collection thereof, shall keep such records, render such statement, make

such returns, and comply with such rules and regulations as the Secretary may from time to

time prescribe."  26 U.S.C. § 6001.  The applicable regulations state that taxpayers "shall keep

such permanent books of account or records, including inventories, as are sufficient to establish

the amount of gross income, deductions, credits, or other matters required to be shown by such

person in any return of such tax or information." 26 C.F.R. § 1.6001-1(a).

Despite the fact that the Plaintiff has introduced no original records pertaining to the

claimed Canterbury Run LP expenses, Plaintiff argues that he should be entitled to deduct such

expenses because the IRS concluded that the FLP was his "alter ego." *See* Plaintiff's

Response, p. 33.  However, the Plaintiff does not point to any place in the record demonstrating

that the IRS officially found the FLP to be his "alter ego."  Plaintiff's argument relating to "alter

ego" is based on one unofficial notation made by Agent Hissam in his notes pertaining to his

audit that was not incorporated into any legal finding by the IRS and was not mailed to the

Plaintiff in connection with the IRS's initial investigation. *See* [Doc. No. 38-18].  However, in its

official Notice of Deficiency provided to the Plaintiff, the IRS indicated that:

> Because the Canterbury Run, LP that you treated as receiving the "Sch C: Rent
> expense" payments that were deducted on your 1998, 1999 and 2000 individual
> income tax returns has no economic substance, the "Sch C: Rent expense"
> amounts do not qualify for deductions as ordinary and necessary business
> expense under I.R.C. § 162.

[Doc. No. 24-4, p. 8].  The Notice of Deficiency is dated February 3, 2003 while Agent Hissam's

unofficial report transmittal was dated several months later on September 12, 2003. *See* [Doc.

Nos. 24-4, 28-18].  Thus, Plaintiff has provided no evidence that the IRS officially determined

that the FLP was an "alter ego" rather than an entity lacking in economic substance.  His citation

to one use of the term "alter ego" in the IRS auditor's investigation notes does not create a

material issue of fact regarding this issue.

With respect to Plaintiff's argument that the IRS found the FLP to be his "alter ego," the

IRS cites several cases explaining the difference between a sham or an entity that lacks

economic substance and an "alter ego" of a corporation.  For example in *Harris v. United States*

the Fifth Circuit noted that whether a corporation is "a separate taxable entity is not the same

question as whether it was an alter ego for the purpose of piercing the corporate veil."  764 F.2d

1126, 1128 (5th Cir. 1985).

In *United States v. Creel*, the Fifth Circuit addressed whether an individual taxpayer could deduct $2,000,000 in losses on his personal tax return where the losses were sustained by a corporate entity that the bankruptcy court had determined to be his "alter ego."  711 F.2d 575 (5th Cir. 1983).  The Fifth Circuit reversed the bankruptcy court and the district court and determined that the taxpayer could not deduct the losses on his personal tax return.  *Id.* at 581. In that case the individual taxpayer incorporated a company to manage the taxpayer's ranch and cattle.  *Id.* at 576.  The individual was the subject of involuntary petitions in bankruptcy under Chapter 7.  *Id.* at 577.  The IRS filed twelve million dollars of tax claims against the individual, and the trustee in bankruptcy sought to deduct two million in losses on the taxpayer's tax return, arguing that the corporation was merely the alter ego of the taxpayer.  *Id.*

The Fifth Circuit addressed whether the district court and the bankruptcy court erred by determining that the corporate entity was the individual's alter ego for all purposes, including tax purposes.  711 F.2d at 578.  It held that the corporate entity could not be ignored for tax purposes.  *Id.*  Relying on *Moline Properties, Inc. v. Comm'r of Internal Revenue*, the Fifth Circuit determined that the corporation was a separate taxable entity "organized for a business purpose and actually carried on business activity."  *Id.* (citing *Moline Properties, Inc. v. Comm'r of Internal Revenue*, 319 U.S. 436, 63 S.Ct. 1132 (1943)).

In response to the trustee's argument that the corporation's corporate form must be disregarded as a "mischievous fiction," the Fifth Circuit responded:

> The fact is, however, that in the corporate context, "alter ego" and "sham" are not synonymous, as the case law illustrates.  A sham corporation may be one established for no valid purpose, such as a corporation formed solely for the purpose of escaping taxation or defrauding creditors. . . .

> Clearly such a corporation might be held to be an alter ego for the purpose of piercing the corporate veil and allowing the corporate creditors to reach the assets of the individual.  So long as the corporation meets the test set forth in *Moline Properties*, however, it remains a separate taxable entity.

*Id.* at 579.  The Fifth Circuit ruled that for income tax purposes, the corporation had to be viewed
as a separate entity from the individual taxpayer and the individual could not deduct the
corporation's losses.  *Id.* at 580-81.

In *In re Coleman* the bankruptcy court also determined that the taxpayer's corporation
was a separate taxable entity even where he was the sole shareholder and he withdrew money
from the corporation's funds that were not treated as dividends or as loans to be repaid.  417
B.R. at 718-721.  The bankruptcy court noted that "[t]here are several court decisions
recognizing corporations as separate taxable entities even though the corporations served
extremely limited purposes."  *Id.* at 721 (citing *Britt v. United States*, 431 F.2d 227, 235-37 (5th
Cir. 1970); *Tomlinson v. Miles*, 316 F.2d 710, 711 (5th Cir. 1963)) (other citation omitted).
Relying on *Creel* the bankruptcy court noted that:

> a sham corporation is one established for no valid purpose – such as a
> corporation formed solely to escape taxation – and does not engage in any
> business activity.  On the other hand, a corporation that is the alter ego of its
> shareholders and regarded by its owners as a simple "dummy" remains a
> separate taxable entity, even though its corporate veil might be pierced to allow
> the corporate creditors to reach the assets of the individual shareholders. . . .
> As the Supreme Court in *National Carbide* made abundantly clear, the doctrine
> set forth in *Moline Properties* ignores the fact that a corporation is substantially
> the alter ego of its shareholders and instead focuses on the reasons why the
> dummy corporation was created and what business it actually conducted.

*Id.* at 722 (citing *Creel*, 711 F.2d at 578; *National Carbide Corp. v. Commissioner*, 336 U.S. 422,
69 S.Ct. 726, 93 L.Ed. 779 (1949); *Moline Properties*, 319 U.S. 436).

In this action the FLP filed its own tax returns and deducted expenses relating to the
operation of the horse farm.  *See* [Doc. Nos. 24-13, 24-14, Ex. 110].  In addition, the Plaintiff
admits that the FLP was formed to facilitate his estate planning.  In *Britt v. United States* the
Fifth Circuit noted that although "[b]usiness activity is required for recognition of the corporation
as a separate taxable entity; the activity may be minimal."  431 F.2d 227, 237 (5th Cir. 1970).  In
that case the court analyzed the business activities of corporations in various cases and found

that "[w]hat has evolved from the numerous cases on the subject is the principle that the

corporate entity generally will be recognized rather than disregarded for tax purposes.  Only in

exceptional circumstances will courts ignore the separate existence of corporations."  *Id.* at 233.

In *Britt* two brothers formed the corporations at issue to encourage their children to take an

interest in their fruit growing business, to provide the children with additional income, and to

facilitate the estate planning of the brothers.  *Id.* at 229.  The Fifth Circuit determined that these

business activities were sufficient for recognition of the corporations as separate taxable

entities.  *Id.* at 237-38.

There is evidence in the record that Canterbury Run LP was a legitimate business.  Ms.

Cooper, testified in her deposition that she managed the property as a horse farm and worked

as a "horse professional" on the property.  Cooper Dep., p. 13.  She asserted that she trained

horses, provided lessons in horseback riding, and that she bred horses.  *Id.*  She also provided

therapy for injured horses at the horse farm and at one point in time bred dogs at the property.

*Id.* at pp. 13-14.  The court concludes that the business activities of the FLP were sufficient to

require its recognition as a separate taxable entity.  Thus, the Plaintiff cannot, almost a decade

later, deduct expenses relating to the horse farm that have already been deducted by the FLP.

Even if the Plaintiff were entitled to deduct such expenses, he has failed to provide any

documentation that substantiates the expenses or demonstrates that he personally paid them.

In addition, until the transfer of the horse farm to the FLP in 2001, Dawn Cooper owned the

horse farm.  Plaintiff decided to file his tax returns separately from her for the years prior to the

farm's transfer to the LLP.  Plaintiff thus cannot deduct the farm's expenses for the years prior to

the transfer.  For these reasons, there is no genuine issue of material fact regarding whether the

Plaintiff is entitled to deduct the expenses associated with the horse farm.

### D.    Collateral Estoppel

The IRS argues that the Plaintiff is collaterally estoped from arguing that the penalties

and fees assessed against him should be abated.  It contends that the OPR Decision, its

affirmance on appeal, as well as the Final Judgment entered by the U.S. District Court for the

Middle District of Tennessee all preclude the Plaintiff from rearguing the substance of the

propriety of the penalties.

The Plaintiff responds that he did not admit to wrongdoing in the Final Judgment and

that there was no trial or discovery in that litigation.  He also asserts that he did not participate in

the OPR hearing and that the ALJ violated his due process rights by failing to accommodate his

hearing disability.  Therefore, he argues, the OPR Decision cannot have collateral estoppel

effect when he did not have an adequate opportunity to litigate the decision.

> Collateral estoppel, or issue preclusion, requires proof of these elements:
>
> (1) the precise issue raised in the present case must have been raised and
> actually litigated in the prior proceeding; (2) determination of the issue must have
> been necessary to the outcome of the prior proceeding; (3) the prior proceeding
> must have resulted in a final judgment on the merits; and (4) the party against
> whom estoppel is sought must have had a full and fair opportunity to litigate the
> issue in the prior proceeding.

*Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 650 (6th Cir. 2007) (quoting *NAACP, Detroit

Branch v. Detroit Police Officers Ass'n (DPOA)*, 821 F.2d 328, 330 (6th Cir. 1987)).

> To apply the doctrine of res judicata the following elements should be present:
>
> "(1) there is a final decision on the merits of the first action by a court of
> competent jurisdiction; (2) the second action involves the same parties, or their
> privies, as the first; (3) the second action raises an issue actually litigated or
> which should have been litigated in the first action; and (4) there is identity of
> claims."

*Hamilton's Bogarts*, 501 F.3d at 650 n.4 (quoting *Walker v. General Tel. Co.*, 25 F.App'x. 332,

336 (6th Cir. 2001)).  Federal rules of claim preclusion will apply when the prior litigation ending

in a judgment that might be granted preclusive effect was in federal court.  *See In re Kmart

Corp.*, 362 B.R. 361, 379-80 (Bankr. N.D. Ill. 2007).

Initially, it is important to note that the U.S. Supreme Court has determined that

administrative agency determinations may be entitled to res judicata or collateral estoppel

effect.  For example, the Supreme Court has noted that "[w]hen an administrative agency is

acting in a judicial capacity and resolved disputed issues of fact properly before it which the

parties have had an adequate opportunity to litigate, the courts have not hesitated to apply res

judicata to enforce repose."  *United States v. Utah Construction and Mining Co.*, 384 U.S. 394,

422, 86 S.Ct. 1545, 1560 (1966) (superseded by statute on other grounds) (citing *Sunshine*

*Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 60 S.Ct. 907 (1940)) (other citations omitted).

Relying on *Utah Construction and Mining*, the Supreme Court noted in *Astoria Fed'l Sav. and*

*Loan Ass'n v. Solimino* that:

> We have long favored application of the common-law doctrines of collateral
> estoppel (as to issues) and res judicata (as to claims) to those determinations of
> administrative bodies that have attained finality. . . . Such repose is justified on
> the sound and obvious principle of judicial policy that a losing litigant deserves no
> rematch after a defeat fairly suffered, in adversarial proceedings, on an issue
> identical in substance to the one he subsequently seeks to raise.  To hold
> otherwise would, as a general matter, impose unjustifiably upon those who have
> already shouldered their burdens, and drain the resources of an adjudicatory
> system with disputes resisting resolution.

501 U.S. 104, 107-08, 111 S.Ct. 2166 (1991) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S.

322, 326, 99 S.Ct. 645, 649 (1979)).

As the Third Circuit has noted, "'it is well established that res judicata precludes a party

both from relitigating matters already litigated and decided and from litigating matters that have

never been litigated, yet should have been advanced in an earlier suit.'"  *Huck on Behalf of Sea*

*Air Shuttle Corp. v. Dawson*, 106 F.3d 45, 49 (3d Cir. 1997) (quoting *Julien v. Committee of Bar*

*Examiners*, 923 F.Supp. 707, 716 (D. V.I. 1996) (citing 18 Charles A. Wright, *et al.*, Federal

Practice and Procedure § 4406 (1981)).

In addition, courts have explained the scope of a "full and fair opportunity to litigate"

within the context of res judicata and collateral estoppel.  As the Supreme Court explained in

*Kremer v. Chem. Const. Corp.*, "what a full and fair opportunity to litigate entails is the

procedural requirements of due process." 456 U.S. 461, 483 n.24, 102 S.Ct. 1883, 1898 n.24

(1982). A "'[r]edetermination of issues is warranted if there is reason to doubt the quality,

extensiveness, or fairness of procedures followed in prior litigation.'" *Id.* at 481, 102 S.Ct. at

1897 (quoting *Montana v. United States*, 440 U.S. 147, 164 n.11, 99 S.Ct. 970, 973 n. 11

(1979)). However, as the Supreme Court cautioned, "[w]e must bear in mind that no single

model of procedural fairness, let alone a particular form of procedure, is dictated by the Due

Process Clause. 'The very nature of due process negates any concept of inflexible procedures

universally applicable to every imaginable situation.'" *Kremer*, 456 U.S. at 483, 102 S.Ct. at

1898 (quoting *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 610, 94 S.Ct. 1895, 1901 (1974)).

In *Kremer* the Supreme Court determined that the plaintiff had received adequate due

process from the state agency that reviewed his charge of employment discrimination. 456 U.S.

at 483, 102 S.Ct. at 1898. The plaintiff's claims were subject to an investigation by the state

agency, and the plaintiff was entitled to a full opportunity to present a record of his charges

against the employer. He could submit exhibits and present testimony from witnesses. He was

also provided the right to have an attorney and to issue subpoenas. If the agency found

probable cause of discrimination existed after the investigation, then the agency had to hold a

public hearing on the merits. Judicial review of the agency determination was also available.

*Id.* at 483-84, 102 S.Ct. at 1899. The Supreme Court determined that it had "no hesitation in

concluding that this panoply of procedures, complemented by administrative as well as judicial

review, is sufficient under the Due Process Clause." *Id.* at 484, 102 S.Ct. at 1899.

In this action the Plaintiff complains that he did not receive due process at the OPR

hearing. He details his allegations of lack of due process in his declaration. *See* Settles Aff.

However, the OPR Decision, as well as the Initial Decision on Appeal indicate that Plaintiff did

receive procedural safeguards. Plaintiff complains that he could not afford an attorney at the

hearing. He further asserts that although he was present at the hearing, he did not cross-

examine witnesses, make any arguments or testify on his own behalf.

However, the Plaintiff does not dispute that he was entitled to hire an attorney to represent him.  Further, he does not dispute that he filed a summary judgment brief and post hearing proposed findings and conclusions.  *See* OPR Decision, p. 3.  He further filed a response to the initial proposed disciplinary proceedings.  *Id.*

The OPR Decision describes Plaintiff's behavior at the hearing in detail:

> On July 13, 2005, Settles filed a document in this case entitled "Respondent's Tender of Settlement and Notice of Non-participation in Hearing."  In it he stated: "The Respondent respectfully notifies the Court that he will not participate in the hearing . . . ."  In response, he was reminded of the provisions of section 10.71(d) of the rules, 31 C.F.R. § 10.71(d), that if he failed to appear at the hearing, he would be deemed to have waived his right to a hearing and be subject to a default decision.
>
> At the beginning of the hearing, after entering an appearance, Settles made the following statement: "[A]s I provided notice to you and to Mr. Klein, I do not intend to present evidence, nor do I intend to participate as a witness.  I am here as an observer . . . ." (Tr. 6.)  When asked if he wanted to make an opening statement, Settles replied: "No, your Honor, just that I will not participate, since I do not have counsel." (Tr. 12.)  When exhibits were offered and he was asked if he had any objection to them, he responded: "I am not participating, your Honor, so –," or words to that effect.  (Tr. 21, 29, 50.)  When asked if he wanted to cross-examine the Director's witnesses, he stated: "No, your Honor.  I repeat, I'm not participating," or similar words (Tr. 27, 99.)  Finally, at the close of the Director's case, when asked if he had anything to present, he said: "I'm not participating, your Honor."  (Tr. 104.)
>
> Thus, while the Respondent technically did not "fail to appear," he did not participate in the hearing, but was present only as an observer.  The Director's uncontested and unrebutted evidence clearly and convincingly establishes all but two of the charges against Settles.

OPR Decision, p. 3.

Although the Plaintiff did not participate in the OPR hearing, the ALJ indicated in the OPR Decision that he considered arguments by the Plaintiff at both the summary judgment level and the trial level.  OPR Decision, p. 19.  The ALJ stated:

> The evidence in this case is clear, convincing, unchallenged and unrebutted.  Settles presented no evidence at the hearing.  He did not cross-examine any of the witnesses.  He did not object to any of the exhibits.  The arguments he

makes in his briefs are based, not on the evidence at the hearing, but on a
motion for summary judgment, consisting mainly of Settles' self-serving affidavit,
that was made before the hearing.  Neither the motion nor any of the exhibits
accompanying it are evidence in this matter.

At the close of the hearing, Settles stated that "the purpose [*sic*] that I haven't
participated is, I can't represent myself when I can't hear." (Tr. 105.)  As he has
through much of this case, Settles waited until the hearing was concluded, and
he could not be challenged, to present an argument.  He made no mention of his
hearing problem when he filed his notice of non-participation prior to the hearing,
nor when he announced at the beginning of the hearing that he would not
participate.  Despite his failure to raise the issue, efforts were made at the
beginning to accommodate his problem, from looking into the possibility of his
using earphones, to positioning counsel, to moving his table closer to the witness
stand, to trying an amplified audio system.  (Tr. 1,8, 12-15.)  Nonetheless, since
he had announced that he was not participating, making sure that he could hear
was not deemed critical to proceeding with the hearing.  Had he raised the issue
at the beginning, greater efforts would have been made to insure that he could
hear.  By waiting until the close of the hearing, I hold that he waived any
complaint of not being able to hear.

OPR Decision, p. 19.

The OPR Decision stands in stark contrast to Plaintiff's allegations of denial of due

process.  However, even considering the facts in the light most favorable to the Plaintiff, it

becomes clear that the Plaintiff had an opportunity to participate in the hearing.  Plaintiff

complains that he could not afford an attorney; however, there is no due process right to an

attorney paid for by the state at a civil IRS OPR proceeding.  Plaintiff presents no authority for

such a position.  Thus, Plaintiff chose, for financial reasons, not to hire an attorney to represent

him.  He also does not deny that he was present at a hearing where witnesses presented

testimony and exhibits in support of the IRS's claims.  He further does not deny that he filed a

summary judgment brief, a trial brief, and proposed findings of fact and conclusions of law.

That the ALJ did not find his materials to have merit does not mean that the ALJ failed to

consider the materials, as the Plaintiff contends.

The Plaintiff further appealed the OPR Decision and obtained review by an expert on

IRS and tax issues.  *See* [Doc. No. 38-10, Ex. J].  The Initial Decision on Appeal addressed the

Plaintiff's claims of lack of due process in detail, including his claims for failure to accommodate

his hearing deficiency, alleged denial of discovery, failure to provide counsel, ex parte

communications, and the ALJ's lack of tax expertise.  *Id.* at 18.  The Special Counsel to the

Senior Counsel for the IRS issued a twenty-page, single-spaced opinion addressing all of the

Plaintiff's contentions on appeal of the disbarment proceedings.  He vacated and remanded the

case to the ALJ for review of two issues, including the ultimate sanction of disbarment and the

ALJ's findings with respect to Count 13 relating to 31 C.F.R. § 10.51 charges of disreputable

conduct, and reversed the ALJ on another count.  He affirmed the OPR Decision in all other

respects.  *Id.* at 20.  The ALJ then reviewed the decision again on remand and determined to

maintain the sanction of disbarment.  *See* Remand Decision.  The Special Counsel reviewed

the Remand Decision and affirmed it in all respects.  *See* Remand Appeal Decision.

The court concludes that based on the evidence in the record, the Plaintiff was provided

with a full and fair opportunity to litigate his position regarding his use of a tax shelter and his

promotion of a tax shelter before the OPR as determined in the OPR Decision, the Initial

Decision on Appeal, the OPR Remand Decision, and the Remand Appeal Decision.  His

positions were considered at the hearing level, on appeal, on remand, and on the review of the

remand decision.  He had notice of the hearing; he was present at the hearing; he was trained

as an attorney and practiced as a tax attorney for over 20 years prior to the hearing; he could

have hired an attorney; he could have informed the ALJ he was unable to hear at the beginning

of the proceeding; and the ALJ and Special Counsel considered numerous memoranda of law

filed by him.  The Plaintiff is an attorney with full knowledge of the tax laws and with an ability to

present his arguments in briefing.  He testified in his deposition that his decision not to

participate was influenced by advice he received from another attorney.  [Doc. No. 38-14,

Plaintiff's Affidavit in Support of Brief in Opposition to Defendant's Motion for Summary

Judgment, ¶ 73].  The court finds that the prong of adequate opportunity to litigate of collateral

estoppel is met.

The court further finds that the other elements of collateral estoppel are present for

purposes of the tax shelter and promoter issues determined in the OPR Decision and OPR

Remand Decision.  The precise issue pertaining to promoter penalties pursuant to 26 U.S.C. §

6700 were addressed in the OPR Decision. The statute provides in relevant part that penalties

may be assessed against the following individuals:

> Any person who –
> (1)(A) organizes (or assists in the organization of) –
> (i) a partnership or other entity,
> (ii) any investment plan or arrangement, or
> (iii) any other plan or arrangement,
> . . . and
> (2) makes or furnishes or causes another person to make or furnish . . .
> (A) a statement with respect to the allowability of any deduction or credit, the
> excludability of any income, or the securing of any other tax benefit by reason of
> holding an interest in the entity or participating in the plan or arrangement which
> the person knows or has reason to know is false or fraudulent as to any material
> matter, . . .
> shall pay, with respect to each activity described in paragraph (1), a penalty
> equal to the $1,000 . . . from such activity.

26 U.S.C. § 6700.  The I.R.C. also provides for the imposition of negligence and accuracy-

related penalties.  The statute states in relevant part:

> (a) **Imposition of Penalty.** – If this section applies to any portion of an
> underpayment of tax required to be shown on a return, there shall be added to
> the tax an amount equal to 20 percent of the portion of the underpayment to
> which this section applies.
> (b) **Portion of underpayment to which section applies.** – This section shall
> apply to the portion of any underpayment which is attributable to 1 or more of the
> following:
> (1) Negligence or disregard of rules or regulations.
> (2) Any substantial understatement of income tax. . . .

26 U.S.C. § 6662(a)-(b).

The OPR Decision describes in great detail how the Plaintiff "developed a patently

fraudulent tax strategy to avoid paying the taxes he normally would have owed" and then

"marketed the scheme to other tax payers, to encourage and advise them to defaud the

government." OPR Decision, p. 19. The ALJ, Todd Hodgdon, determined that 34 individuals,

couples or businesses had bought the Plaintiff's tax shelter. *Id.* at 13. He further concluded

that the Plaintiff had violated 31 C.F.R. §§ 10.33(a)(3)-(4) and 10.34(a) by "organizing,

promoting, and selling tax packages lacking economic substance involving the use of multiple

entities, including trusts, partnerships and corporations to shelter participants' income and serve

as vehicles for improper expenses through the manipulation of asset transfers and assignments

of income." OPR Decision, p. 16. A review of the OPR Decision in its entirety leaves no doubt

that the ALJ considered the issues pertinent to determining whether § 6700 promoter penalties

and § 6662 negligence penalties should apply.

The determination of these issues was central to the disbarment outcome of the OPR

Decision, thus satisfying the second prong of the collateral estoppel analysis. The third prong

requires a final judgment on the merits. The OPR Decision was a decision of disbarment; the

decision was reviewed on appeal and on remand and affirmed after review on remand. Thus,

this prong is also satisfied. The court has already determined that the fourth prong of the

collateral estoppel analysis has been met. Thus, the court concludes that the Plaintiff is

collaterally estopped from relitigating his § 6700 penalties and the § 6662 negligence penalties

based on the final decision on the merits determined by the OPR. [Doc. No. 38-10, Ex. J; Doc.

Nos. 24-9, 24-10, 24-11, Exs. 106, 107, 108].

The court has concerns regarding whether the Plaintiff should be precluded from

challenging the §§ 6700 and 6662 penalties based upon the Final Judgment entered on March

24, 2003 by the U.S. District Court for the Middle District of Tennessee. [Doc. No. 24-17, Ex.

112]. The second paragraph of the consent judgment specifically states that "[t]he Court finds

that Settles has neither admitted nor denied the United States' allegations that he has engaged

in conduct that is subject to penalty under §§ 6700 and 6701 of the Code and that interferes

with the enforcement of the Internal Revenue Laws." *Id.* This language makes clear that the

district court did not determine that the Plaintiff had engaged in activities subject to § 6700

penalties.  Therefore, the court concludes that it will not undertake an analysis regarding

whether the district court consent judgment is entitled to collateral estoppel effect.  However, the

court also concludes that it does not need to make such a determination because the court has

already found that the Plaintiff is precluded from relitigating the §§ 6700 and 6662 penalties

based on the OPR Decision.

> **E.      Abatement of Penalties**

The Plaintiff suggests that he should be entitled to an abatement of the penalties

assessed against him.  Plaintiff's Response, p. 38.  The I.R.C. allows for the abatement of

penalties if the taxpayer demonstrates that a failure to pay timely "is due to reasonable cause

and not due to willful neglect."  26 U.S.C. § 6651(a).  The IRS points out that courts have found

that "the lack of funds sufficient to pay taxes, coupled with the use of available funds for other

purposes, does not constitute 'reasonable cause' under 26 U.S.C. § 6651(a)."  *Hopkins v.*

*United States (In re Hopkins)*, No. 91-11856, 1991 WL 289179 (Bankr. D. Col. Oct. 22, 1991)

(citing *Jones v. Comm'r*, 259 F.2d 300 (5th Cir. 1958)) (other citations omitted).

As one district court explained:

> The failure to file and failure to pay penalties may be abated if the taxpayer can
> demonstrate that the failure to perform was due to reasonable cause and not
> willful neglect.  26 U.S.C. § 6651.  The standard adopted for determining whether
> reasonable cause existed for the failure by a taxpayer to comply with any of the
> Internal Revenue Code provisions is whether such person exercised ordinary
> business care and prudence but was nevertheless unable to perform the act(s)
> required of him.  *See Treas. Reg.* § 301.6651-1(c)(1).  Willful neglect may be
> read as meaning a conscious, intentional failure or reckless indifference.
> A failure to pay will be considered due to reasonable cause to the extent that the
> taxpayer makes a satisfactory showing that he exercised ordinary business care
> and prudence in providing for payment of his tax liability and was nevertheless
> either unable to pay the tax or would suffer an undue hardship if he paid on the
> due date.  Treas. Reg. § 301.6651-1(c)(1) and 1.6161-1(b).  The term "undue
> hardship" means more than just an inconvenience to the taxpayer.  It must
> appear that substantial financial loss, for example, loss due to the sale of
> property at a sacrifice price, will result to the taxpayer from making the payment
> on the due date.

*Smith v. United States*, No. W-99-CA-261, 2000 WL 1358726, at *7 (W.D. Tex. Aug. 8, 2000). In *Smith* the district court found no reasonable cause for the taxpayers' failure timely to pay their taxes when they earned significant income during the years at issue, they paid many other creditors, and they made a number of "lavish expenditures," including a ski boat, a car for their son, two motorcycles, and a "four-wheeler," despite their alleged financial hardships. *Id.* at *6-7. As the court determined, a "[l]ack of funds on the due date which is the result of payments to other creditors is not reasonable cause." *Id.* at *8.

In this case, even the Plaintiff's unfiled tax returns demonstrate that he had substantial amounts of income from his law practice during period of time when he should have paid the taxes. [Doc. No. 24-12, Ex. 109]. The record demonstrates that he paid other creditors with some of his funds, including spending substantial sums on rebuilding a new house after his other home burned. *See* [Doc. No. 24-23, Ex. 118]. The records from Plaintiff's Quicken software summarizing Plaintiff's income and expenses for 1998 to 2002 reflect that the Plaintiff spent several hundred thousand dollars for his home construction. *Id.* These records also demonstrate significant amounts of income from Plaintiff's law practice. *Id.* Thus, the court concludes that even if the issue of the tax penalties were before it, there is no genuine issue of material fact that Plaintiff cannot meet his burden of proof regarding his entitlement to an abatement.

To the extent that the Plaintiff argues that he is entitled to an abatement of the negligence penalties relating to the understatement of tax pursuant to 26 U.S.C. § 6662(d)(2)(B)(i), the court concludes that this argument is also without merit. This provision allows reduction of penalties where there is "substantial authority" for the proposed tax treatment. 26 U.S.C. § 6662(d)(2)(B)(I). The I.R.C. clearly provides that there cannot be a reduction in penalties under 26 U.S.C. § 6662(d)(2)(B) made for "any item attributable to a tax shelter." 26 U.S.C. § 6662(d)(2)(C).

Although Plaintiff now tries to argue that he neither engaged in tax shelter activities nor tried to promote tax shelters to his clients, the substantive issues relating to whether he promoted or participated in a tax shelter were either waived by his failure to contest the initial assessment or by estoppel based on the findings of the OPR. The court must determine whether there is any issue of fact related to the amount of the tax liability under 11 U.S.C. § 505(a)(1). As this court has found *supra*, the Plaintiff has not substantiated his entitlement to the income differences or the deductions for expenses he claims on his unfiled tax returns. Nor has he demonstrated a genuine issue of material fact regarding whether his promoter penalties and negligence penalties should be relitigated based on the ruling by the OPR.

Plaintiff attempts to navigate around the exception for reductions of penalties relating to tax shelters by relitigating the substantive merits of his tax strategy. Although the court recognizes that this issue is not properly before it, the court notes that the main case cited by the Plaintiff in support of his strategy relating to the transfer of "goodwill" actually supports the IRS's position regarding his tax scheme. *See Bateman v. United States*, 490 F.2d 549 (9th Cir. 1973). In that case the IRS contended that trusts established for the taxpayers' children were not real partners in the taxpayers' limited partnership and that a corporate shell which was also assigned a limited partnership interest in the taxpayers' food broker limited partnership was a sham. *Id.* at 551. The district court had assigned the "good will" of the taxpayers' food brokerage limited partnership a value of between $405,000 and $463,000 for the relevant years in question. *Id.* at 552. The IRS argued that the goodwill was not goodwill of the business, but was merely "personal to the taxpayers." *Id.* The Ninth Circuit accepted the finding of the district court regarding the "goodwill" of the business. It noted in a footnote that the limited partnership in question:

> was a substantial business entity. During the years in question, it had 8 limited partners other than the [taxpayers] as well as 28 to 30 additional employees. The salaries paid to the [taxpayers] were reasonable and were less than one-

third of the amount of the salaries paid to other employees.  Finally, the purchase
of partnership interests by unrelated third parties supports the finding that the
good will of [the limited partnership] was not personal to the [taxpayers].

*Id.* at 552 n.4.  The Ninth Circuit further explained that "[h]ere, there was evidence of the value

of the good will of [the limited partnership] based upon unrelated third party purchases of

partnership interests. . . . We agree with Judge Wright's dissent to the extent that had the good

will been personal to [the taxpayers], the transfers of interests to the trusts would not have

received tax recognition. . . . Based upon these facts, it appears that the [taxpayers] were not

transferring personal income to the trusts."  *Id.* at 552-53.[3]

      In contrast to *Bateman*, the facts, even as admitted by the Plaintiff, indicate that the

Plaintiff was transferring his personal income in the form of "goodwill" that he alone valued to

the FLP.  There was no arm's length negotiation or valuation by unrelated third parties.  Thus,

the court concludes that were the issue of the appropriateness of the negligence penalties

before it, there is no genuine issue of material fact regarding whether the Plaintiff participated in

a tax shelter and that he lacked substantial authority for his tax strategy.

      In support of his theory of substantial authority for his tax scheme, the Plaintiff sends the

court down several miscellaneous rabbit holes.  For instance, he makes assertions such as

"Plaintiff also notes that, according to agent Hissam's undocumented testimony . . . , a similar

goodwill tax strategy was appealed by one of his clients.  In that case, the appeals division

found the strategy was not negligent, and removed agent Hissam's assessment of negligent

---

[3]  The court notes that the IRS subsequently issued an Action on Decision ("AOD") that
specifically disagrees with the Ninth Circuit's decision in *Bateman.  In re Bateman v. United
States*, AOD 1975-244, 1975 WL 38219 (Aug. 4, 1975).  In this AOD, the IRS states plainly,
"[t]he Ninth Circuit's decision is wrong.  It is our view, supported by other authority, that when a
business consists essentially of the rendition of services, capital is not a material-income
producing factor, notwithstanding that substantial amounts of capital, including goodwill, may be
used to facilitate the rendition of the services. . . . The goodwill facilitates the rendering of these
services, but absent the exercise of the judgment and skill of the partners the goodwill is
useless as a producer of income."  *Id.*

penalties.  Removal of such penalties signifies the IRS' agreement that the strategy was supported by substantial authority."  Plaintiff's Response, p. 22.  When the court reviews the record cited by the Plaintiff for support of this proposition, it finds the OPR Decision, which states that "[t]hirty-four individuals, couples or businesses purchased Settles' tax shelter.  All of them were audited by the IRS for using the tax shelter and all but two of them agreed, at the revenue agent or group manager level, to changes in their returns.  Of the two who did not agree, one lost at the IRS Appeals Division, had to pay the tax changes but received a settlement on the penalty, and the other involved a charitable remainder unit trust." OPR Decision, p. 13.  The OPR Decision states immediately after that the "[t]he Settles tax shelter has never been upheld by the IRS or any court of competent jurisdiction."  *Id.*  Thus, despite Plaintiff's contentions otherwise, nowhere in the cited authority is there an indication that the IRS determined that substantial authority supported the Plaintiff's tax strategy.  *Id.*

For the reasons stated *supra*, the court concludes that the Plaintiff has failed to demonstrate a genuine issue of material fact regarding his substantive entitlement to an abatement of penalties.

The Plaintiff also raises the question of the accrual of interest on the taxes.  The IRS did not request a decision on the amount of interest that should have accrued and the amount of interest due remains an issue for trial.

### V.    Conclusion

As the court has explained in detail *supra*, it concludes that the Plaintiff has failed to demonstrate that a genuine issue of material fact exists regarding his tax liability.  The Plaintiff bears the substantive burden of proof of demonstrating his entitlement to his deductions for expenses.  He has failed to substantiate the alleged income and expenses listed in his unfiled tax returns.  The time period for changing his filing status from married filing separately to married filing jointly has expired, and there is no genuine issue of material fact regarding

whether his ex-wife intends to sign the amended returns.  Plaintiff also has failed to demonstrate any entitlement to claiming the expenses of his ex-wife's horse farm because the horse farm expenses were already deducted on the original FLP tax returns, the horse farm was not transferred to the FLP until 2001, and the Plaintiff failed to substantiate the expenses and demonstrate that he personally paid them.  Finally, collateral estoppel applies to preclude the Plaintiff from relitigating the substantive promoter and negligence penalties assessed by the IRS.

The IRS' motion for summary judgment will be **GRANTED**.  The court reserves ruling at this time regarding the calculation of interest and the IRS's agreement to abatement of interest during the course of this adversary proceeding to provide the Plaintiff with an opportunity to respond to the IRS's provision of a declaration regarding this issue.

A separate order will enter.

# # #